**Cloide C. BRANNING, d/b/a Pleasant Point Plantation, a Partnership, Plaintiff,**

**and**

**Morgan Guaranty Trust Company of New York; Bankers Trust of South Carolina; Citizens and Southern Financial Corporation; J. B. Kinghorn and A. M. Kinghorn, d/b/a Kinghorn Building Supply Co.; South Carolina Tax Commission; Southern Turf Grass Seeds, Inc.; and Uniroyal, Inc., Third-Party Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 400–76.**

United States Court of Claims.

July 1, 1981.

Francis H. Clabaugh, Beaufort, S. C., for plaintiff;  Barry L. Johnson, Beaufort, S. C.,

atty. of record. Dowling, Sanders, Dukes, Novit & Svalina, P. A., Beaufort, S. C., of counsel.

Joseph R. Bankoff, Atlanta, Ga., atty. of record, for Morgan Guaranty Trust Co. of New York. King & Spalding, Atlanta, Ga., of counsel.

George H. O'Kelley, Beaufort, S. C., atty. of record, for Bankers Trust of South Carolina; J. B. Kinghorn and A. M. Kinghorn, d/b/a Kinghorn Building Supply Co.; Southern Turf Grass Seeds, Inc.; and Uniroyal, Inc.

John W. Minor, Hilton Head Island, S. C., atty. of record, for Citizens and Southern Financial Corp. Adams, Adams, Brennan, Gardner & Hughes, Hilton Head Island, S. C., of counsel.

Daniel R. McLeod, Columbia, S. C., atty. of record, for South Carolina Tax Commission.

James E. Brookshire, Columbia, S. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant. Peter D. Coppelman, Walter J. Postula, and Joseph J. McGovern, Dept. of Justice; Veronica Meade and Edward Passarelli, Dept. of the Navy; and Captain John L. Wittenborn, United States Air Force, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION
PER CURIAM:

This case is before the court on exceptions to the report of Trial Judge Francis C. Browne.

After consideration of the briefs and oral argument of the parties, we adopt the report, as modified, as an opinion of this court. Because we find it unnecessary to reach the issue of whether there was a "sonic" easement, we delete that portion of

the report discussing the issue. Additionally, we delete that portion of the report dealing with rights of third-party plaintiffs; thus, who shares in the award shall be determined at the time of the final judgment.

The novelty of this decision is in its holding that defendant's use of airspace at altitudes above 500 feet, and independent of landing and takeoff, may be a taking of land beneath if the use is peculiarly burdensome. A vital factor of this case is that defendant devised an exercise to prepare trainees for future landings on aircraft carriers, in which heavy jet aircraft followed one another almost nose to tail in an unvarying loop over plaintiff's land. Trainees were required to hold their planes, preparatory for landing on the supposititious carrier deck, with noses up and tails down, with near maximum power (and noise) associated with low speed. Defendant could have performed this exercise elsewhere but selected airspace over plaintiff's land for it because alternative locations were deemed even more objectionable. Thus, plaintiff was consciously singled out or selected to bear a burden which defendant also consciously elected not to impose on others, even others otherwise similarly situated. This is a classic statement of a taking situation. Whether use of airspace above 500 feet for noisy air navigation of a more conventional variety can be held a taking is an issue that can be and is reserved for the case that presents it. In this case our taking holding turns on the peculiar facts the trial judge has found.

The trial judge's report, as modified, follows.[1]

## OPINION *
BROWNE, Trial Judge:

This is an action for recovery of just compensation for the alleged taking of an easement over plaintiff's property by "inverse condemnation" as a consequence of

---

1. The findings of fact have been submitted to the parties and with the exception of the "Ultimate Finding and Conclusion" are adopted by the court. We do not reprint the findings of

fact here because the facts necessary to resolve this case are set forth in the report.

* The opinion and conclusion of law are submitted in accordance with Rule 134(h).

the operation of defendant's aircraft over that property.[1]

Plaintiff is a general partnership in which Cloide C. Branning (hereinafter referred to *in personam* as "Branning") is the "surviving" partner. The partnership was formed and operated under the name "Pleasant Point Plantation." Defendant is, of course, the United States of America. Morgan Guaranty Trust Company of New York (hereinafter referred to as "Morgan") has joined in the action as a third-party plaintiff in view of its alleged equitable interest in the property.[2]

The court has jurisdiction of the subject matter and the parties under Title 28, United States Code, Section 1491, the claim being founded on the fifth amendment to the Constitution of the United States, it being alleged that defendant has taken the subject property without due process of law and without just compensation.

### Synopsis

The Pleasant Point Plantation partnership (hereinafter referred to as "plaintiff"), is a general partnership which was formed in 1973 in Beaufort, South Carolina, by Cloide C. Branning, H. Jack Pendley, Jr., and David M. Pendley. Plaintiff acquired a tract of approximately 525 acres on Lady's (or Ladies) Island, Beaufort County, South Carolina, known as "Pleasant Point Plantation" (hereinafter referred to as the "property") from Pleasant Point Plantation, Inc., a South Carolina corporation, the stock of which had been owned by Branning prior to sale of the property to plaintiff.

The United States Marine Corps Air Station, Beaufort (hereinafter referred to as "MCAS-Beaufort") is located northwest of the city of Beaufort; it is just across Brickyard Creek, due west of plaintiff's property. Defendant established the facility as a naval air station in 1943 and it served as a training base for the Navy until 1946, when it was disestablished. Ten years later (1956), it was recommissioned as a Marine Corps Auxiliary Air Station and, in 1961, was redesignated as a Marine Corps Air Station. The basic mission of the station was, and still is, to provide facilities for Marine Corps aircraft operations and training.

One type of training conducted on and around the station consists of practice landings and takeoffs designed to simulate aircraft carrier takeoffs and landings. One type of operation is referred to as "field mirror landing practice" (FMLP). In the course of such operation, the prescribed flight pattern requires the trainees to take off from the runway on the station and then fly defendant's aircraft directly over plaintiff's property in a "racetrack pattern" at an altitude of 600 feet above ground level (AGL) and return to the runway. The pattern is repeated by each aircraft several times, the training exercise being conducted squadron-by-squadron (and virtually nose-to-tail at 25 to 30-second intervals) over a period of several days during each month in which training is conducted. Originally such training employed single-engine (A–4) and vertical takeoff (AV–8 Harrier) aircraft, but later employed twin-engine (F–4) aircraft.[3]

---

1. Such "taking" has been referred to in reported cases variously as an "avigation easement" (by analogy to the sovereign's right of navigational servitude in navigable waters of the sovereignty) and as an "easement of flight" (by analogy to easements taken by the sovereign in the airspace over land for public purposes).

2. In addition to Morgan, other third-party plaintiffs (creditors of plaintiff) have appeared, but Morgan is the only third-party plaintiff who actively participated in the trial of the case or has presented post-trial submissions as a third-party plaintiff.

3. FMLP operations are required before a pilot can be deemed "combat ready," and thus qualified to fly carrier operations. The operations must be practiced both during the daytime and at night. Since a pilot is only deemed to be qualified for 3 months after flying FMLPs, an F–4 squadron will usually fly FMLPs just prior to being assigned to duty on a carrier.

When FMLP operations are being conducted there can be as many as six aircraft in the air at once (up to four aircraft if the practice is at night). The planes make about 10 practice landings and loops and then must refuel. While one group of planes is refueling, another is in the air. The aircraft are spaced about 30

A second type of operation is one which does not employ the field mirror system, but is a "Touch-and-Go" pattern. In this exercise, the aircraft fly the same "racetrack pattern" directly over plaintiff's property, but the aircraft pass over the plaintiff's property at 1,000 feet AGL instead of 600 feet AGL.

Plaintiff asserts that the noise created by the frequence and altitude at which the defendant's F-4 aircraft fly over the subject property on Lady's Island, particularly in the FMLP pattern, has reduced or destroyed the value of the property for its highest and best use, namely, for single family residential use and development as provided in plaintiff's master plan.

In support of its position plaintiff relies upon "Air Installation Compatability Use Zone" (hereinafter referred to as "AICUZ") studies and charts prepared on behalf of, adopted, published, and implemented by defendant. These studies are relied upon to establish that property located in the "CNR 3" zone, as plotted in the studies and charts, has been rendered "clearly unacceptable" [4] for low, medium, or high density residential use as a consequence of defendant's aircraft overflights. Plaintiff further relies upon defendant's admission in its answer that " * * * CNR Zone 3 is regarded as unsuitable for residential use or development."

Morgan goes one step further and contends that there has also been a taking by defendant of all property located in the "CNR 2" [5] zone, as plotted in the AICUZ studies and charts, since property in that zone is "normally unacceptable" for residential use and, therefore, may not be used for its highest and best use.

Defendant denies that its operations over plaintiff's property constitute a taking, since the altitude at which the aircraft fly over plaintiff's property is not below 500 feet AGL, and the noise created by operation of flights at 600 feet AGL by any type of aircraft, regardless of the noise created, does not constitute a taking of plaintiff's property.

Defendant also contends that as long as none of the flights were below 500 feet AGL over plaintiff's property, publication of defendant's AICUZ studies and charts cannot constitute a taking of plaintiff's property under the fifth amendment to the Constitution of the United States either by itself or coupled with actual flights at or above 500 feet AGL over plaintiff's property.

### MCAS-Beaufort Operations

MCAS-Beaufort [6] is a military installation of the United States of America and is part of a complex which includes the Marine Corps Recruit Depot at nearby Parris

seconds apart. When flying FMLPs, the pilots keep the wing flaps down during the entire operation (in what is known as a "dirty" configuration) at 80–85 percent of full power. Since flying in a "dirty" configuration requires that more thrust be employed than would otherwise be needed, the noise is consequently much greater than if the plane was flying a normal pattern. Thus, during the weeks when FMLPs are being conducted, F-4 aircraft pass directly over the plaintiff's property, with over 80 percent of full throttle applied, every 30 seconds almost continuously throughout the morning, afternoon, and sometimes at night.

This pattern is referred to in *Lacey v. United States*, 219 Ct.Cl. 551, 595 F.2d 614 (1979), as the "field carrier landing practice" pattern. The only difference between the pattern flown in *Lacey* (at the Naval Auxiliary Landing Field-Orange Grove, Texas) and that flown at MCAS-Beaufort is that the prescribed altitude for the pattern at NALF-Orange Grove was 450 feet

AGL (above ground level), whereas the prescribed altitude over plaintiff's property in the present case was 600 feet AGL.

4. "*Clearly unacceptable*: The noise exposure at the site is so severe that construction costs to make indoor environment acceptable for performance of activities would be prohibitive. (Residential areas: *The outdoor environment would be intolerable for normal residential use*)." (Emphasis supplied.)

5. "*Normally unacceptable*: The noise exposure is significantly more severe so that unusual and costly building constructions are necessary to insure adequate performance of activities."

6. Beaufort is pronounced "Bu'fĕrt" in South Carolina, whereas the name is pronounced "Bo'fôrt" in North Carolina where a city of the same name is located.

Island and the U. S. Naval Hospital at nearby Port Royal. All are located in Beaufort County, near the City of Beaufort, South Carolina.

Beaufort County is located in the southeastern corner of South Carolina, along the Atlantic coast between Charleston, South Carolina, and Savannah, Georgia. The City of Beaufort and the Navy-Marine Corps complex lie between the Broad River on the west and the Beaufort and Coosaw Rivers on the east and north. The Broad and Beaufort Rivers converge into Port Royal Sound opposite the well-known resort area known as Hilton Head Island, South Carolina, just south of Beaufort.

Beaufort County's economy is dominated by two major factors—its geographic and climatic conditions and, secondly, by the presence of the military. More than 50 percent of the labor force in the county is military. Indeed, historically the area has played a significant role in maritime operations along the southeast Atlantic coast. Port Royal Island was claimed by Spanish explorers in 1521, but the entire area was claimed by the British in 1663. Beaufort was chartered as a town in 1710, and has been designated as a national historical site. However, as was the case with any other areas of the South, Beaufort County suffered from the consequences of the Reconstruction and the Great Depression of the 1930's. Even the World War II era of the 1940's did little to help the economy in the area.

During the 1950–60 decade, however, the population of Beaufort County increased by 63.7 percent, largely due to immigration of military-oriented people from other counties in the region. As a consequence, the area became more urbanized and more subject to the problems which result from urbanization. One of such problems was land use and the impact of various land uses on the environment.

In 1942 (during the early years of World War II), the Beaufort County Board of Directors reached an agreement with the Civil Aeronautics Administration to establish an airport at the present site of MCAS-Beaufort. The site was acquired by defendant and designated for use as a major naval air station; operational facilities were completed in 1943. It was used from 1943 to 1946 as a Navy training base and was disestablished in 1946.

For 10 years the site was not used by defendant. However, in 1956 defendant, having a need for a jet aviation base in the southern Atlantic coastal area, recommissioned the station as a Marine Corps Auxiliary Air Station. Five years later, in 1961, the station was redesignated as a Marine Corps Air Station.

The evidence in this case does not disclose what types of jet aircraft operated from MCAS-Beaufort in the 1960's, but a compilation of data for the period 1963 to 1970 shows the number of aircraft operations under IFR (Instrument Flight Rules) and VFR (Visual Flight Rules), quarter-by-quarter for each year during that period. The original records from which that compilation was made are not in evidence, but the compilation is deemed to be a business (and historical) record and is acceptable as the best evidence available for the purpose of determining the number of such operations during that period.

A record maintained as an "Air Traffic Activity Report" shows the same type of information on a semi-annual basis from July 1, 1970 to December 31, 1977. This form, however, also adds the number of radar approaches and divides the operations into categories of military and civilian aircraft; it further distinguishes the military aircraft operations between Navy/Marine Corps and Other Military.

### Aircraft Noise Impact Studies

The Navy Facilities Engineering Command (Southern Division) of the Department of the Navy, pursuant to a directive from the Department of the Navy, contracted with Tracor, Inc. (hereinafter referred to as "Tracor"), of Austin, Texas, to conduct a study of aircraft and related noise in the vicinity of MCAS-Beaufort at that time. A report was submitted to the

Commanding Officer of that command on May 14, 1973. The report was based on measurement of aircraft noises both on and off the station and on information and records provided by station personnel. The data and measurements were used to prepare "Composite Noise Rating" (CNR) contours to serve as a guide to compatible land uses and for evaluation of existing and projected noise impact on the community in and around MCAS-Beaufort, including the City of Beaufort and Lady's Island. The computations were based on the numbers and kinds of aircraft in use at the station at the time and the anticipated operations for the ensuing year.

Since the plaintiff did not acquire the property in suit until after the Tracor study was completed, consideration must be given not only to the altitude at which defendant's aircraft have flown over the property, but also the type of aircraft and the frequency or timing of the flights both before and after plaintiff acquired the property in order to determine whether or not the taking of an easement occurred while plaintiff was the owner of the subject property.

The Tracor study was completed by May 14, 1973. Plaintiff acquired the property in suit on November 28, 1973. As of May 14, 1973, there had been, on the average, 1,222 FMLP operations per month. Those operations normally occurred within one 5-day week for F–4 and A–4 aircraft, and within two 5-day weeks for AV–8A [7] aircraft. All such operations were under VFR and no aircraft but the A–4, F–4, and AV–8 performed the FMLP operation.

The 1973 study reported that the average number of F–4 and A–4 FMLP operations were equal, i. e., 389 each, per month, based on one 5-day week, each, per month. Also, at that time 29 percent of the total station operations were conducted by F–4's, 29 percent by the A–4's, 35 percent by the AV–8's, 3.5 percent by T–28's and 3.5 percent by transport aircraft. However, only about 14 percent of the F–4 operations (or 4 percent of all operations) were FMLP operations by the F–4 aircraft.

In late 1975, Tracor was employed as a consultant to the firm of Burns and McDonnell under a NAVFAC contract to do another aircraft noise study with respect to the aircraft and related noise then existing and projected in the vicinity of MCAS-Beaufort. The study was completed in 1976. The 1976 study was based, in part, on the data and measurements made for the 1973 study. New CNR contours were prepared for the expected 1976 operations. An additional set of CNR contours was prepared which depicted the effects of various operational changes that had been recommended and accepted for implementation in the AICUZ study prepared by Burns and McDonnell.

The operations data reflected in the Tracor report dated December 13, 1976, (but based on data obtained in late 1975), shows that the A–4 FMLP operations had dropped to zero, but the F–4 FMLP operations had increased to an average of 1,400 per month, all of which occurred during one 7– to 10–day training period each month. This was almost four times the average number of F–4 FMLP operations in 1973, and was almost two times the total average number of monthly combined F–4 and A–4 FMLP operations in 1973. Thus the total noise impact on the area was increased by a combination of the greater number of F–4 operations and the greater noise level created by the F–4 aircraft.

The difference in F–4 FMLP activity between 1973 and 1976 is attributable to the fact that in 1973 there was but one squadron (12 aircraft) of twin-engine F–4's stationed at MCAS-Beaufort, and five squadrons (60 aircraft) of single-engine A–4's, whereas by December 1976, there was an entire Marine Air Group (MAG–31) consisting of five squadrons of F–4's (60 aircraft at full strength) and no A–4 squadrons stationed at MCAS-Beaufort.[8]

7. The AV–8, however, did not fly the same "racetrack" FMLP pattern over plaintiff's property since that aircraft operates on a vertical takeoff principle.

8. The record establishes that much of the time one of the five F–4 squadrons (12 of the 60 planes) was on TDY (temporary duty) at one or another of the other stations in the United

There is nothing in the record of this case to explain why 600 feet was the prescribed altitude for the F–4 FMLP pattern at MCAS-Beaufort, whereas an altitude of 450 feet was prescribed at NALF-Orange Grove. The evidence does, however, establish that the F–4 "racetrack" FMLP pattern at MCAS-Beaufort was wider and shorter than that of the F–4's and A–4's for Touch-and-Go landing operations. In either case, the aircraft flew over a part of plaintiff's property, but more F–4's traversed plaintiff's property than A–4's. The prescribed altitude for the FMLP pattern on the downwind leg of the pattern (over plaintiff's property) at one time was 800 feet but later was reduced to 600 feet, thus increasing the noise level on the ground. The reason for or the date of that change, however, is not known, and neither the flight path nor the pattern altitude for FMLP's as of 1973 was mentioned in the 1973 Tracor report.[9]

### AICUZ Study and Report

The Air Installation Compatible Use Zone (AICUZ) Program has been instituted in an effort to coordinate the requirements of the missions of military air installations, with the development of the surrounding communities. The AICUZ is a concept of identifying compatible and incompatible land use around an air station, the purpose being to guide compatible private development through cooperation with local jurisdictions in order to minimize public exposure to aircraft noise and accident potential, while at the same time maintaining the operational capability of the station.

The AICUZ studies take into account two principal factors. One is the aircraft noise

impact on the area; the other is the aircraft accident potential. The areas impacted by aircraft noise are designated as CNR (Composite Noise Rating) Zones, whereas the aircraft accident potential areas are designated as APZ (Accident Potential Zones). The area of the highest aircraft noise impact (115 decibels[10] and above, at ground level) is designated as CNR Zone 3, the area of modest noise impact (100 to 115 decibels) is designated as CNR Zone 2, and the areas of little, if any, noise impact (less than 100 decibels) are designated as CNR Zone 1.

The APZ's are classified as "Clear Zone," "APZ-I" or "APZ-II," depending on whether the area is most critical (Clear Zone), moderate potential for aircraft accidents (APZ-I) or least critical, but possessing some potential for aircraft accidents (APZ-II).

In the course of preparing the AICUZ study for MCAS-Beaufort, 13 specific possible operational modifications were investigated and analyzed. These 13 possible modifications were in addition to the various noise-related changes that had been made in the past. At least two of these possible changes in the operations at MCAS-Beaufort would have significantly reduced the noise over plaintiff's property. Of the 13 modifications considered, only 6 of them were considered to be of sufficient benefit to be implemented. However, none of the six that were accepted had any significant effect on the noise levels over plaintiff's land.[11]

Among the operational modifications specifically considered and rejected by the Marine Corps was to terminate future FMLP training operations at MCAS-Beaufort and

States. It also establishes that MAG–31 was not always at full TO (table of organization) strength, either in terms of aircraft or pilots.

9. The only logical assumption which can be made is that there was a desire to lower the altitude of the downwind leg to be only slightly above the level of an aircraft carrier deck above the water level without going below the 500-foot level prescribed by the Federal Aviation Administration as the safe level of flight of all aircraft over private property.

10. The Composite Noise Rating is measured in PNdB. The CNR is a way to describe quantitatively the acoustic energy of sound as it relates to the subjective feelings of loudness, noisiness or annoyance that would be experienced by an observer.

11. One of the six operational modifications which was accepted to be implemented with the AICUZ study was not actually carried out because of a perceived conflict with safety criteria.

transfer these training exercises to Page Field on Parris Island. This would have eliminated the flights that are the cornerstone of plaintiff's complaints. An analysis of this alternative disclosed that such a transfer would create an equivalent noise problem in the Page Field area and would adversely impact other residential areas.

The Marine Corps similarly rejected a proposal to raise the FMLP training flight pattern altitude from 600 to 1,000 feet. This would have lessened the noise level over plaintiff's property caused by these flights. In adopting the AICUZ study, the Marine Corps concluded that this alternative should be rejected since it would be a nonstandard FMLP flight pattern and contrary to the training procedure and the requirements of the base mission for MCAS-Beaufort. Thus, it was decided that the plaintiff landowner should bear the burden of aircraft noise and low-level flights even though such flights would render the property clearly unacceptable for normal residential use.

The evidence in this case clearly establishes that the CNR Zone 3 and CNR Zone 2 "footprints" include portions of plaintiff's property on Lady's Island. This is not, in and of itself, sufficient to establish a taking of plaintiff's property by the defendant. It does, however, constitute valuable evidence of the impact of defendant's aircraft operations on that part of plaintiff's property over which defendant's A-4 and F-4 jet aircraft were operating when flying the FMLP pattern.

The ultimate facts found in this case are:

1. Defendant's F-4 aircraft made standard operational flights over plaintiff's property in performing FMLP training by the squadrons of a full air group at a level flight altitude of 600 feet (plus or minus 50 to 100 feet) AGL which aircraft created more noise than the previously flown A-4 aircraft and such greater noise was sufficient to constitute an immediate and direct intrusion upon plaintiff's property, which intrusion was so substantial as to detract from and interfere with plaintiff's full enjoyment of the property by limiting plaintiff's exploitation of it as a medium density residential development, its highest and best use.

2. Defendant has not only intruded upon plaintiff's property but has also given public notice of the adverse effect thereof upon plaintiff's property by adopting, publishing, and approving for implementation the AICUZ study of 1976 in which at least part of plaintiff's property has been designated as unsuitable or unacceptable for medium density residential use.

3. All of the foregoing acts of defendant occurred during the time plaintiff was the owner of the property in suit and the present action was brought less than 6 years after plaintiff's claim against defendant first accrued. The value of plaintiff's property right and the exact date of the taking are left for determination in further proceedings under Rule 131(c).

4. There has been no assignment to plaintiff of any claim against defendant, the claim asserted by plaintiff having first accrued to plaintiff after plaintiff acquired the property in issue.

*The Case Law*

The leading case in the realm of "inverse condemnation" as a consequence of the flight of aircraft over private property ("avigation easements") is *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). The most recent decision of the Court of Claims on this subject, however, is *Lacey v. United States*, 219 Ct.Cl. 551, 595 F.2d 614 (1979). In the 33-year interval between *Causby* and *Lacey* there have been a goodly number of cases involving differing factual situations and different governmental entities. Also within the last few years numerous articles have been written on the subject of "noise pollution" [12] in which noise impact, alone, is considered

---

12. *See, e. g.*, "Airport Noise Regulation: Burbank, Aaron and Air Transport" 8 *Trans.L.J.* 403 (1976) and "Current State of the Law in

Aircraft Noise Pollution Control" 43 *J. Air L. & Com.* 799 (1977).

to be the source of the encroachment on private property, notwithstanding the particular altitude at which the aircraft passes over the property.

The Supreme Court long ago put to rest the ancient common law doctrine that ownership of the land extends to the periphery of the universe. In *United States v. Causby, supra*, the Supreme Court held that "[t]he airspace, apart from the immediate reaches above the land, is part of the public domain." 328 U.S. at 266, 66 S.Ct. at 1068. In *Causby*, it was not necessary to define "the immediate reaches" to which the limits of a landowner's rights extend above the land, and the Court expressly declined to do so. *Id.* The Court of Claims, in applying the holding of *Causby*, likewise has avoided a definition of the "immediate reaches" of private ownership, stating: "[t]he *Causby* case established the rule that flights by Government-owned aircraft over private land are a 'taking' under the Fifth Amendment of an easement in the overhead airspace if such flights are *so low* and so frequent as to be a direct and immediate interference with the use and enjoyment of the land." *Lacey v. United States*, 219 Ct.Cl. at 553, 595 F.2d at 615 (emphasis supplied).

At the time of *Causby*, Congress had legislated that "[t]he United States of America is hereby declared to possess and exercise complete and exclusive national sovereignty in the air space above the United States * * *." 49 U.S.C. § 176(a) (1940) (current version at 49 U.S.C. § 1508(a) (1976)). Congress had also recognized and declared that every citizen of the United States has "a public right of freedom of transit in air commerce through the navigable air space of the United States." 49 U.S.C. § 403 (1940) (current version at 49 U.S.C. § 1304 (1976)). "Navigable airspace" was then defined as "airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority [CAA] * * *." 49 U.S.C. § 180 (1940).[13]

The aircraft in *Causby* passed over the plaintiff's land along a glide path at an altitude of 83 feet, and thus were not within "the navigable airspace" which Congress had declared to be in the public domain. Thus the United States was not immune from suit under the above statutes and the taking of an easement, in the constitutional sense, was found. The Court pointed out that had the CAA (now the FAA) prescribed 83 feet as the minimum safe altitude of flight, the validity of the regulation would *then* have been called into question. 328 U.S. at 263, 66 S.Ct. at 1066.

Congress' regulatory power over air navigation (or "avigation") and the public right of freedom of travel in the navigable airspace of the United States is analogous to, stems from, and is subject to the same constitutional limitations as Congress' regulatory power over, and the public's right to travel in the "navigable waters" of the United States. It was upon this premise that Congress declared the "navigable airspace" to be a "public highway" in the Air Commerce Act of 1926, ch. 344, 44 Stat. 568 (1926).

In enacting the 1926 Act, Congress intended to apply existing principles of the law of water transportation to air transportation. The House report accompanying the bill stated:

> The provisions of the bill are *not unique or unprecedented*. In practically every case each provision has a precedent in an existing provision of law, and is modeled upon and often paraphrased from it. Usually these existing provisions are those of the marine navigation laws. This is natural for the reason that air space, with its absence of fixed roads and tracks and aircraft with their ease of maneuver, present as to transportation practical and legal problems similar to those presented by transportation by vessels upon the high seas.

\*     \*     \*     \*     \*     \*

---

**13.** The existing statutes and regulations as applied to the facts in *Causby v. United States*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), were interpreted to mean that "the nav-

igable airspace" began at 500 feet above Causby's land. (There was no allowance, in that interpretation, for takeoffs or landings.)

The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or nonnavigable waters. *The public right of flight in the navigable air space owes its source to the same constitutional basis which, under the decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States,* regardless of the ownership of the adjacent or subjacent soil. [H.R.Rep. No. 572, 69th Cong., 1st Sess. 9–10 (1926); emphasis supplied.]

█ The Federal Government's plenary power to regulate navigable airspace is unquestionable. However, just as the aquatic navigational servitude does not afford a blanket exemption from the taking clause of the fifth amendment whenever Congress exercises its commerce clause authority to regulate aquatic navigation, *Kaiser Aetna v. United States,* 444 U.S. 164, 172, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979), the avigational servitude does not preclude application of the taking clause when Congress, in acting to regulate aviation, exceeds its reasonable power to regulate.

Subsequent to the decision in *Causby,* as part of the Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731, Congress redefined "navigable airspace" to mean "airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." 49 U.S.C. § 1301(26) (1976).[14] In *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), the Supreme Court was faced with a situation where flights along a glide path above the plaintiff's land, while below 500 feet, were nevertheless within the navigable airspace as declared by Congress in the 1958 Act. The Court held that a taking had occurred despite the fact that the landing planes were within the navigable airspace

of the United States as defined by Congress and as determined by the applicable regulations. 369 U.S. at 88–89, 82 S.Ct. at 533.

This court in *Aaron v. United States,* 160 Ct.Cl. 295, 311 F.2d 798 (1963), found that owners of property over which planes flew at an elevation of less than 500 feet were entitled to compensation, but they were not entitled to compensation for flights above 500 feet although they may have been "inconvenienced to some extent by these flights." *Id.* at 300, 311 F.2d at 801. But as the court pointed out:

This is not to say that a case could not arise where the unavoidable damage to a person's property occasioned by travel in the navigable air space would be *so severe* as to amount to a practical destruction or a *substantial impairment* of it. When such a case arises we would then have to consider whether the relevant statutes and regulations violated the property owners' constitutional rights * * *. [*Id.* at 301, 311 F.2d at 801; emphasis supplied.]

This is such a case and the facts warrant such consideration.

The spirit of the *Causby* rule was evident in the Federal courts even prior to the Supreme Court's decision in *Causby. See Cory v. Physical Culture Hotel, Inc.,* 14 F.Supp. 977, 982 (W.D.N.Y.1936) (Although his rights to the airspace are limited, the owner of the surface may prevent the use of airspace above that actually occupied by him to the extent that its use unreasonably interferes with his complete enjoyment of the surface. "The height at which an airplane operator may pass above the surface without trespassing is a question depending for solution on the facts in the particular case, and this question is unaffected by the regulations promulgated * * * under the Air Commerce Act of 1926 * * *.").

As the Court of Appeals for the District of Columbia Circuit has more recently pointed out in another context, although the navigable airspace has been declared to be in the public domain, " '[r]egardless of

14. It is of interest to note that subsequently Congress defined "navigable waters" to mean

"waters of the United States." 33 U.S.C. § 1362(7) (1976).

*any congressional limitations*, the land owner, as an incident to his ownership, has a claim to the superjacent airspace' to the extent that a reasonable use of his land involves such space." *Palisades Citizens Association, Inc. v. C. A. B.*, 420 F.2d 188, 192 (D.C.Cir.1969) (footnote omitted and emphasis supplied).

■ Thus it is clear that the Government's liability for a taking is not precluded merely because the flights of Government aircraft are in what Congress has declared to be navigable airspace and subject to its regulation.[15]

In virtually all of the cases in which recovery has been awarded for the overflights of aircraft, the value of the land in question was diminished, not by the mere presence of the aircraft in the superjacent airspace, but by the attendant noise. Under the "great weight" of Federal authority, noise alone, without an actual physical invasion of the *superjacent* airspace, is merely consequential damage within the rule of *Richards v. Washington Terminal Co.*, 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914),[16] and thus not compensable under the fifth amendment. *Batten v. United States*, 306 F.2d 580 (10th Cir. 1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502 (1963); *Avery v. United States*, 165 Ct.Cl. 357, 330 F.2d 640 (1964); *Town of East Haven v. Eastern Airlines, Inc.*, 331

F.Supp. 16 (D.Conn.1971), *aff'd on other grounds*, 470 F.2d 148 (2d Cir. 1972).

On the other hand, many State courts have allowed recovery for a taking based solely upon the impact of noise from aircraft flights without regard to whether there was also a physical invasion of the *superjacent* airspace. *E. g., Thornburg v. Port of Portland*, 233 Or. 178, 376 P.2d 100 (1962); *Henthorn v. Oklahoma City*, 453 P.2d 1013 (Okl.1969).[17]

The *Thornburg* case involved flights along two different flight paths. Planes flying in the first path flew close to the plaintiffs' land but not directly over it; the noise created by the planes was equivalent to a nuisance. As to these flights the court reasoned:

> If we accept, as we must upon established principles of the law of servitudes, the validity of the propositions that a noise can be a nuisance; that a nuisance can give rise to an easement; and that a noise coming straight down from above one's land can ripen into a taking if it is persistent enough and aggravated enough, then logically the same kind and degree of interference with the use and enjoyment of one's land can also be a taking even though the noise vector may come from some direction other than the perpendicular. [376 P.2d at 106.]

15. By further analogy, since owners of property adjacent to the navigable waters of the United States must not be made to suffer uncompensated damage such as that resulting from an abnormal wake caused by vessels plying the navigable waters, owners of property subjacent to the navigable airspace of the United States should not be made to suffer the damages caused by abnormal aircraft noise without just compensation especially where the flights by Government-owned aircraft directly and immediately interfere with the use and enjoyment of the land.

16. Although this case is said to have been decided on a theory that a physical invasion is required for a taking, the compensable damage that was found to exist was not accompanied by a physical invasion, but the damage resulted from an overt act of defendant which caused the smoke and noise to be directed over plaintiff's property. Furthermore, there have been

many cases in the Supreme Court, this court, and other Federal courts where the fifth amendment taking of land was found to have been effected without an actual physical invasion of the surface of that land. *See, e. g., Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (a taking of the subjacent property); *Drakes Bay Land Co. v. United States*, 191 Ct.Cl. 389, 424 F.2d 574 (1970) (isolation of and denial of access to plaintiff's property).

17. These cases were decided under the same legal framework of the present case. Other states have constitutions which grant broader relief to property owners than the Federal constitution; they provide right to compensation when property is taken *or damaged*. *See, e. g., Martin v. Port of Seattle*, 64 Wash.2d 309, 391 P.2d 540 (1964). These other cases will not be further considered herein.

There was a dissent in *Thornburg* which agreed with the majority opinion in *Batten v. United States, supra.*

As to the second flight path, however, the court was unanimous. The second flight path took planes directly over the plaintiff's property at low altitudes, but in excess of 500 feet. The court, in reversing the trial court, held that these flights should have also been considered in determining if there had been a taking.

> Whatever virtue the establishment of a 500-foot floor under the cruising flight of aircraft may have as a matter of *public safety*, there can be only one sound reason to make it a rule of the law of real property. That reason ought to be the knowledge * * * that flights above 500 feet do not disturb the ordinary, reasonable landowner. [376 P.2d at 109–110; emphasis supplied.]

The dissenting Justices, while rejecting the majority's position that an adjacent noise nuisance alone can constitute a taking of property, agreed with the majority that if the flights were in the superjacent airspace, *even if above 500 feet*, such flights could constitute a taking. It was felt by the minority that the *Causby* rule [18] is a "proper rule to balance public and private interests arising from the abolishment of the common-law rule that ownership in land extended upward to the periphery of the universe * * *," 376 P.2d at 111 (dissenting opinion), but that it does not preclude the possibility of a taking where the overflights are above the safe *altitude* of flight, namely, 500 feet AGL, if the evidence shows that, by reason of *noise and vibration alone*, there is serious *interference* in the owner's use and enjoyment of the property.

Although the bare *presence* of noise, without penetration of the superjacent airspace, cannot itself amount to a taking, an *increase* in noise alone, without any change in the nature of the physical invasion, has been held to constitute a *further* taking.

In *Avery v. United States, supra*, the court held that the introduction of a larger, heavier, noisier aircraft can constitute a fifth amendment taking of an *additional* easement even though the noisier aircraft do not violate the boundaries of an earlier easement. The earlier easement in *Avery* had granted the Government the right to fly aircraft over the plaintiffs' land at altitudes as low as 29 feet AGL. The easement was not limited on its face to any particular aircraft, yet the court found a further taking where the plaintiffs established *additional* loss due to the *increase in the noise*. Thus it is clear that noise and its impact are generally of primary importance in determining whether there has been a taking by aircraft overflights.

In *Lacey v. United States, supra*, the property over which defendant's aircraft flew was a large tract of agricultural land located in an uncongested rural area used principally for the grazing of cattle. Such property would be "clearly unacceptable" for such use if located within an AICUZ "Clear Zone," or a "CNR 3" Zone as defined in the AICUZ studies received in evidence in the present case. The evidence in *Lacey* did not include an AICUZ study or classification [19], but it did establish that the prescribed minimum altitude of aircraft flying over plaintiff's property in conducting FMLP operations was 450 feet AGL during the period from 1958 to 1973 with single-engine (A4J and F–9) aircraft, and from 1972 to 1975 with twin-engine (T2C) aircraft.[20] The trial judge concluded that the taking in that case first occurred "not later than

**18.** As set forth on pp. 96–97, *supra.*

**19.** It does not appear from the opinion or findings of fact in *Lacey* that an AICUZ study was ever made in connection with the Naval Auxiliary Landing Field in that case.

**20.** The noise level of the A4J aircraft (introduced in 1969) was 133 decibels at 50 feet AGL and 110 decibels at 1,000 feet AGL, whereas the comparable values for the F–9 (flown from 1958 to 1969) were 131 decibels at 500 feet and 108 decibels at 1,000 feet. Thus, there was no "appreciable difference" in noise level between that created by the A4J and the F–9. The noise level of the T2C aircraft (introduced in 1972) was even lower, the values 127 decibels at 500 feet AGL and 104 decibels at 1,000 feet.

1960" and the action was, therefore, barred under the 6-year statute of limitations (28 U.S.C. § 2501). It was further found, as a fact, that at no time after 1960 did defendant operate its aircraft at altitudes lower than 450 feet AGL nor did it employ any appreciably noisier aircraft in its operations at the base. Thus, there was no "further" taking within the 6 years prior to filing the action due to increased noise or frequency of operations.

The trial judge, in turning to the question of ownership of the *Lacey* property in and prior to the calendar year 1960, found that plaintiffs did not acquire the property until 1971, at the earliest. Thus, the taking had already occurred before plaintiffs acquired the property. Accordingly, plaintiffs in that case would not have been entitled to recover even if the statute of limitations had not been a bar.

The real source of interference with plaintiffs' use of their property in *Lacey* was not the *altitude* of the flights but the *noise* which "made it impossible or difficult to use the telephone in the residence, made conversation on the property impossible or difficult, greatly interfered with television reception in the residence, and interfered substantially with ranch operations (the noise from the aircraft drowned out attempts by the ranch operator to call cattle for feeding operations)." 219 Ct.Cl. at 558, 595 F.2d at 618. There was no evidence whatever that any damage, interference, or inconvenience was caused solely because the *altitude* of the flights was as low as 450 feet above ground level. It was the *noise* created by the overflights which interfered with full use of the property. The opinion concludes that it was as a result of the *noise* that "an avigation easement" had already been taken by the operation of noisy jet aircraft over plaintiffs' property.

■ The facts in the present case are distinguishable from the facts in *Lacey* in two material respects. At NALF-Orange Grove, training operations were conducted with aircraft which generated approximately the same noise (127 to 133 decibels at 50 feet altitude) throughout the whole period under consideration, even though the T2C was a twin-engine (2,950 pounds thrust per engine or 5,900 pounds of total thrust) and the F-9 and A4J were single-engine (7,250 pounds and 8,500 pounds thrust, respectively) aircraft. Also, the total number of operations of aircraft of these types did not increase appreciably during the 6-year period next preceding the filing of the petition. In the present case the twin-engine (33,000 total pounds of thrust) F-4 aircraft replaced the substantially less noisy single-engine (7,800 pounds thrust) A-4 aircraft, and the total number of FMLP operations increased substantially after plaintiff purchased the subject property in November 1973 (and less than 6 years prior to the filing date of the present petition).

The clear implication in *Lacey* was that even if overflights of the F-9, A4J and T2C aircraft at less than 500 feet occurred *more* than 6 years prior to filing the petition, plaintiffs would have prevailed if "appreciably noisier" aircraft were introduced for the first time *within* the 6-year period prior to filing the petition. It follows, therefore, that the introduction of the full Marine Air Group of noisier F-4 aircraft into MCAS-Beaufort, after November 1973, created a new cause of action in the present case even though fewer and less noisy overflights were conducted at 600 feet AGL prior to plaintiff's acquisition of the property, regardless of whether the earlier flights had constituted a partial taking.

■ The question thus raised is whether the 500-foot altitude is so critical a measure of the avigational servitude that liability can be avoided simply by flying noisier aircraft at an altitude of 501 feet. Minimum *safe altitude* and minimum *noise levels* are concerned with two different things.[21] While safety may be measured in terms of

21. It is noted that the Federal Aviation Administration has promulgated regulations regarding noise standards for aircraft which are wholly apart from flight regulations. *See* Title 14, C.F.R., Part 36 (1980).

altitude, a reasonable noise level cannot be measured solely in terms of altitude.[22]

The present case is a case, as the court foresaw in *Aaron v. United States*, 160 Ct.Cl. at 301, 311 F.2d at 801, in which "the unavoidable damage [reduction of the highest and best use] to a person's property occasioned by [the noise created during] travel in the navigable air space [is] so severe as to amount to a practical destruction of it." This is a case of first impression in which the court may consider the altitude of the flights over the property, but must give primary consideration to the effect of aircraft noise where the Government itself has adopted and published standards of compatability of use of the subjacent property. Since the subjacent property owner has suffered a diminution of the value of the property in this case, there has been a taking of an easement over and through the airspace superjacent the property of the plaintiff. It is abundantly clear that under the law established by *Causby*, *Griggs*, and *Aaron* a taking has occurred in this case.

### Identity of Plaintiff

■ The caption in this case designates plaintiff as "Cloide C. Branning, d/b/a Pleasant Point Plantation, A Partnership." The opening paragraph of the petition repeats, verbatim, the wording of the caption. Although paragraph 2 states that petitioner "resided on the premises located in Beaufort County, State of South Carolina," and paragraph 8 alleges that petitioner has been deprived of "his" free and unmolested use of "his" property, the record clearly establishes that Cloide C. Branning, an individual, did not own the property in suit at the time the petition was filed. Therefore, to do justice as between Branning, individually, and the Pleasant Point Plantation partnership, the petition must be construed as having been filed in the name of the true

owner, Pleasant Point Plantation, a partnership.

The domicile (residence) of the partnership is alleged to be in South Carolina and the address of plaintiff (petitioner) is given at the end of the petition as "Cloide C. Branning, Pleasant Point Plantation, Star Route 5, Beaufort, South Carolina 29002." Thus the partnership is deemed to have been organized and existing under the laws of the State of South Carolina.

When David M. Pendley and H. Jack Pendley, Jr., sold their respective interests in the Pleasant Point Plantation partnership to Cloide C. Branning, the partnership was technically dissolved. However, the partnership had outstanding liabilities which were incurred before the two general partners sold their interests to Branning. Branning, therefore, became the sole surviving partner for the purposes of winding up the affairs of the partnership.

Notwithstanding the sale of the Pendleys' interests in the partnership to Branning, record title to the property in suit was, at the time of filing the petition, and still was at the time of trial, in the name of Pleasant Point Plantation, a partnership. There is no evidence of record to show that Branning, individually, ever took title to the *property* from the partnership or any of the partners. Title went from Pleasant Point Plantation, Inc. (a South Carolina corporation) to Branning and the Pendleys, as individuals (jointly and severally) by deed executed on November 10, 1973. Thereafter, by deed executed November 28, 1973, Branning and the Pendleys, for a nominal consideration and in further consideration of "the formation of Pleasant Point Plantation, a Partnership," conveyed the property in suit to "Pleasant Point Plantation, a Partnership, Its Successors and Assigns."

Under the circumstances, merger of all interest in the *assets* of the partnership in

---

**22.** Gliders, for example, would not be a source of noise impact over a residential area, even if flown at altitudes of less than 500 feet AGL over such an area. However, flight of gliders over property at *any* altitude might constitute a substantial accident risk. Conversely, loud, an-

noying aircraft such as helicopters, repeatedly passing over a residential area at an altitude *above* 500 feet AGL, might well be a source of considerable noise impact and yet not create a substantial accident risk at any given point below.

one individual dissolved the partnership *de jure*, but the partnership continued *de facto* for the purpose of winding up the affairs of the partnership, including the prosecution of this action on the alleged claim of the partnership as holder of record title to the property in suit.

Since the value of the property right taken is to be determined as of the date of taking, determination of both the date of taking and value of the property right taken as of that date are reserved for further proceedings under Rule 131(c).

## CONCLUSION OF LAW

For the foregoing reasons, the court concludes that a taking has occurred. The case is remanded to the trial division under Rule 131(c) for further proceedings. Such further proceedings will determine the date of the taking, the amount of recovery, and who will share in said recovery.