**ADAMAN MUTUAL WATER COMPANY et al.**

v.

**UNITED STATES.**

No. 139–56.

United States Court of Claims.

Oct. 8, 1958.

Edward Jacobson, Phoenix, Ariz., for plaintiffs. Snell & Wilmer, Phoenix, Ariz., were on the brief.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Perry W. Morton, Washington, D. C., for defendant.

PER CURIAM.

This case was referred by the court, pursuant to Rule 45(c), 28 U.S.C.A., to Mastin G. White, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed July 24, 1958. When more than 15 days elapsed

after the filing of this report and neither party gave notice in writing of an intention to except to the commissioner's findings or recommendations, plaintiffs filed a motion for judgment in accordance with the recommendations and findings of the trial commissioner, to which motion the defendant filed a notice of no objection. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Judgment will therefore be entered as provided for in the Conclusion of Law.

It is so ordered.

### Opinion of the Commissioner

This case involves the alleged taking by the defendant of so-called avigation easements over a number of tracts of land situated near the Luke Air Force Base in Maricopa County, Arizona.

A total of 12 different tracts of land are involved in the litigation. On the dates of the alleged takings, one of the tracts (designated as tract No. 36) was owned by the plaintiffs Ralph Ashby and Grace Ashby, husband and wife; one tract (No. 24) was owned by the plaintiffs Raymond F. Austerman and Zula Austerman, husband and wife; six tracts (Nos. 16, 17, 18, 19, 21, and 22) were owned by the plaintiff Goodyear Farms, an Arizona corporation; two tracts (Nos. 23 and 25) were owned by the plaintiffs Carlon A. Hinton and Verna Hinton, husband and wife; one tract (No. 38) was owned by the plaintiffs Harold Ralph Hunt and Georgia May Hunt, husband and wife; and one tract (No. 39) was owned by the plaintiffs George Reismann and Joanna Reismann, husband and wife. (The legal descriptions of the various tracts of land are set out in finding of fact 2.)

All the tracts referred to above are farm lands. They lie to the southwest of, and relatively near to, the Luke Air Force Base, a large airport owned and operated by the defendant for the use of military aircraft.

The Luke Air Force Base was formerly known as Luke Field. It was established in about February of 1941. The construction of runways at the field was commenced in April of 1941 and completed in December of 1942. The runways consisted of a north-south runway, a northwest-southeast runway, a northeast-southwest runway, and an east-west runway. At the time of the completion of these runways in 1942, the north-south runway was approximately 4,285 feet long and each of the other runways was approximately 4,500 feet in length.

Luke Field was used during the period 1942–1946 by the defendant for the training of military pilots. Reciprocating-engine (propeller-type) military aircraft utilized all the runways at the field during that period. Although airplanes taking off to the southwest from, or landing from the southwest on, the northeast-southwest runway at Luke Field during the period 1942–1946 flew over the lands referred to above, those flights by propeller-type military aircraft did not interfere substantially with the respective owners' use and enjoyment of their lands. Hence, there was no taking by the defendant during the period 1942–1946 of avigation easements over the various tracts of land involved in this litigation. Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269.

Luke Field was deactivated on November 30, 1946.

During the Korean crisis, the former Luke Field was reactivated by the defendant in about January 1951 as a permanent military airport, and was designated as the Luke Air Force Base. Jet aircraft were assigned to the base, and the training of combat pilots in the operation of such aircraft was begun at the base.

During the year 1951, the northeast-southwest runway at the Luke Air Force Base was not used for the operation of jet aircraft, because it was not long enough for that purpose. By the end of December 1951, however, the northeast-southwest runway had been lengthened

to 8,800 feet. This runway was then put into regular use for takeoffs and landings by jet aircraft on January 1, 1952.

■ Beginning on January 1, 1952 and continuing since that time, jet aircraft taking off to the southwest from, or landing from the southwest on, the northeast-southwest runway at the Luke Air Force Base have flown over tracts 16, 17, 18, 22, 23, 24, 25, 38, and 39 at such low altitudes and at such frequent intervals as to constitute a direct and immediate interference with the respective owners' use and enjoyment of these tracts. Therefore easements of flight over the tracts listed in this paragraph have been taken by the defendant (United States v. Causby, 1946, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206), and the takings occurred on January 1, 1952, the date when the flights by jet aircraft over such lands began (Highland Park, Inc. v. United States, supra).

In 1954, the existing northeast-southwest runway at the Luke Air Force Base was again extended by the defendant, so that by June 1, 1954 it was 9,910 feet in length. In addition, construction was begun in January 1954 on a second northeast-southwest runway, situated parallel to and relatively near the first northeast-southwest runway. The second northeast-southwest runway was completed to a length of 10,000 feet and placed in regular operation for use by jet aircraft on June 1, 1954.

Since June 1, 1954, when the lengthening of the first northeast-southwest runway and the construction of the second northeast-southwest runway at the Luke Air Force Base were completed, flights by jet aircraft taking off from these runways to the southwest, or landing on these runways from the southwest, have passed over tracts 19, 21, and 36 so frequently and at such low altitudes as to interfere seriously with the use and enjoyment of these tracts by their respective owners. Such flights, therefore, constituted the taking of avigation easements over these tracts by the defendant as of June 1, 1954.

Also, as a result of the lengthening of the first northeast-southwest runway and the construction of the second northeast-southwest runway, frequent flights of jet aircraft over tracts 22, 38, and 39 have occurred at lower altitudes since June 1, 1954 than the flights that took place over these tracts during the period January 1, 1952–May 31, 1954. Hence, there were additional takings on June 1, 1954 by the defendant of avigation easements over these particular tracts within the airspace below that affected by the earlier takings on January 1, 1952.

The interferences by the defendant's jet aircraft with the respective owners' use and enjoyment of the lands previously mentioned have resulted from the noise made and the disturbances created by such aircraft. The noise, averaging 105 decibels and approximating the situation inside a very noisy factory, is inordinately loud and annoying, and constitutes a definite hindrance to communication. As a result of the low and frequent flights of jet aircraft over the tracts of land involved in this litigation, the occupants of the tracts have become nervous and distraught, and farming operations on the tracts have become more difficult, more expensive, and less productive. These tracts have been rendered undesirable for normal residential use and for normal farming operations, and have suffered serious losses in value.

The easements of flight taken by the defendant over the various tracts of land previously mentioned are permanent in nature, as the Luke Air Force Base is a permanent military airport and continued flights by jet aircraft at low altitudes and frequent intervals over such lands are to be expected for the indefinite future.

It necessarily follows that the plaintiffs previously named in this opinion are entitled to recover. The limits of the easements and the values of the property interests taken by the defendant from these plaintiffs are set out in the findings of fact.

The evidence does not show any taking by the defendant of property inter-

ests from the plaintiffs George W. Busey, B. W. Mullins, and James H. Sharp, who are alleged to have been former lessees of certain tracts of land involved in the litigation. Consequently, the petition should be dismissed as to them.

The petition has already been dismissed as to the plaintiff Adaman Mutual Water Company, an Arizona non-profit corporation, on a motion to dismiss filed by that plaintiff.

## Findings of Fact

1. (a) The individual plaintiffs Ralph Ashby and Grace Ashby, husband and wife, Raymond F. Austerman and Zula Austerman, husband and wife, Carlon A. Hinton and Verna Hinton, husband and wife, Harold Ralph Hunt and Georgia May Hunt, husband and wife, and George Reismann and Joanna Reismann, husband and wife, are citizens of the United States and of the State of Arizona.

(b) The plaintiff Goodyear Farms is a corporation organized and existing under the laws of the State of Arizona.

2. On the dates that are material for the purposes of this litigation, the several plaintiffs named below were the owners of the tracts of land in Maricopa County, Arizona, described under their respective names:

(a) Ralph Ashby and Grace Ashby, husband and wife:

Tract No. 36—The E½ of the NE¼ of Sec. 13, Township 2 North, Range 2 West, being a tract containing approximately 80 acres.

(b) Raymond F. Austerman and Zula Austerman, husband and wife:

Tract No. 24—SW¼ of the SW¼, Sec. 18, Township 2 North, Range 1 West, being a tract containing approximately 38.6 acres, more or less, except for approximately 1.3 acres, more or less, more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180, pages 528 to 541, inclusive.

(c) Goodyear Farms:

Tract No. 16—S½ of the NE¼, Sec. 18, Township 2 North, Range 1 West, being a tract containing approximately 80 acres, more or less, except for roads and approximately 1.4 acres, more or less, more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the County Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180 at pages 528 to 541, inclusive.

Tract No. 17—N½ of the SE¼, Sec. 18, Township 2 North, Range 1 West, being a tract containing approximately 80 acres, more or less, except for roads and except for approximately 2.6 acres, more or less, more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the County Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180 at pages 528 to 541, inclusive.

Tract No. 18—76.3 acres, more or less, more particularly described as follows: S½ of the SE¼, Sec. 18, Township 2 North, Range 1 West, with certain exceptions and reservations more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the County Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180 at pages 528 to 541, inclusive.

Tract No. 19—NE¼ of the NW¼, Sec. 18, Township 2 North, Range 1 West, approximately 40 acres, more or less, except for roads and except for approximately 24.61

acres, more or less, being the East 812.06 feet acquired in fee by the U. S. Government by virtue of a declaration of taking and amendment thereto in Civil No. 1949, Phoenix, originally filed November 27, 1953.

Tract No. 21—NW¼ of the NW¼, Sec. 18, Township 2 North, Range 1 West, being a tract containing approximately 38 acres, more or less, except for roads and except for approximately .15 acre, more or less, and except for 10.59 acres, more or less, being a tract more particularly described in that certain deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated May 1, 1952 and filed with the Recorder of Maricopa County, Arizona, May 16, 1952 in Docket 928 at pages 281 and 282.

Tract No. 22—S½ of the NW¼, Sec. 18, Township 2 North, Range 1 West, containing approximately 77.3 acres, more or less.

(d) Carlon A. Hinton and Verna Hinton, husband and wife:

Tract No. 23—77.78 acres, more or less, more particularly described as follows: N½ of the SW¼, Sec. 18, Township 2 North, Range 1 West, with certain exceptions and reservations more particularly described in that certain agreement for sale dated March 7, 1945, by and between Goodyear Farms, an Arizona corporation, as seller and the above-named parties as buyers, said agreement for sale being recorded with the Recorder of Maricopa County, Arizona, on May 2, 1945 in Book 69 of Agreements at pages 333 to 335, inclusive.

Tract No. 25—SE¼ of the SW¼, Sec. 18, Township 2 North, Range 1 West, being a tract containing approximately 40 acres, more or less, except for approximately 1.3 acres, more or less, more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180, pages 528 to 541, inclusive.

(e) Harold Ralph Hunt and Georgia May Hunt, husband and wife:

Tract No. 38—N½ of the SE¼, Sec. 13, Township 2 North, Range 2 West, being a tract containing approximately 80 acres, more or less, except for approximately 1.45 acres, more or less, more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the County Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180 at pages 528 to 541, inclusive.

(f) George Reismann and Joanna Reismann, husband and wife:

Tract No. 39—S½ of the SE¼, Sec. 13, Township 2 North, Range 2 West, being a tract containing approximately 80 acres, more or less, except for approximately 4.01 acres, more or less, more particularly described in that certain quitclaim deed from Goodyear Farms to Adaman Mutual Water Company, an Arizona corporation, dated July 13, 1953 and filed with the County Recorder of Maricopa County, Arizona, August 4, 1953 in Docket 1180 at pages 528 to 541, inclusive.

3. All the tracts referred to in finding 2 are farm lands. They lie to the southwest of, and relatively near to, the Luke Air Force Base, a large airport owned and operated by the defendant for the use of military aircraft.

4. The Luke Air Force Base was formerly known as Luke Field. It was established in about February of 1941. The construction of runways at the field was commenced in April of 1941 and completed in December of 1942. The runways consisted of a north-south runway, a northwest-southeast runway, a northeast-southwest runway, and an

east-west runway. At the time of the completion of these runways in 1942, the north-south runway was approximately 4,285 feet long and each of the other runways was approximately 4,500 feet in length.

5. Luke Field was used during the period 1942–1946 by the defendant for the training of military pilots. Reciprocating-engine (propeller-type) military aircraft utilized all the runways at the field during that period. Although airplanes taking off to the southwest from, or landing from the southwest on, the northeast-southwest runway at Luke Field during the period 1942–1946 flew over the lands referred to in finding 2, those flights by propeller-type military aircraft did not interfere substantially with the respective owners' use and enjoyment of their lands.

6. Luke Field was deactivated by the defendant on November 30, 1946.

7. During the Korean crisis, the former Luke Field was reactivated by the defendant in about January of 1951 as a permanent military airport, and was designated as the Luke Air Force Base. Jet aircraft were assigned to the base, and the training of combat pilots in the operation of such aircraft was begun at the base.

8. During the year 1951, the northeast-southwest runway at the Luke Air Force Base was not used for the operation of jet aircraft, because it was not long enough for that purpose. By the end of December 1951, however, the northeast-southwest runway had been lengthened to 8,800 feet. This runway was then put into regular use for takeoffs and landings by jet aircraft on January 1, 1952.

9. (a) During the period from January 1, 1952 to May 31, 1954, inclusive, takeoffs by aircraft from the northeast-southwest runway at the Luke Air Force Base were made during the several months in the numbers indicated below:

| Month | 1952 | 1953 | 1954 |
|---|---|---|---|
| January ................... | 5,609 | 8,721 | 10,480 |
| February ................. | 4,902 | 8,471 | 10,807 |
| March ................... | 5,863 | 11,254 | 11,945 |
| April .................... | 7,051 | 11,194 | 12,186 |
| May ..................... | 6,901 | 9,913 | 10,131 |
| June .................... | 8,926 | 10,073 | ........... |
| July .................... | 8,466 | 10,159 | ........... |
| August .................. | 8,170 | 8,112 | ........... |
| September ............... | 7,628 | 8,759 | ........... |
| October ................. | 8,806 | 11,262 | ........... |
| November ............... | 7,155 | 9,898 | ........... |
| December ............... | 8,500 | 6,603 | ........... |

(b) Approximately 90 percent of the takeoffs referred to in paragraph (a) of this finding were made toward the southwest and in the direction of the lands described in finding 2.

(c) During the period mentioned in paragraph (a) of this finding and continuing since that time, jet aircraft of the defendant taking off to the southwest from, or landing from the southwest on, the northeast-southwest runway at the Luke Air Force Base have flown over tracts 16, 17, 18, 22, 23, 24, 25, 38, and 39 at such low altitudes and at such frequent intervals as to constitute a direct and immediate interference with the re-

spective owners' use and enjoyment of these tracts.

10. (a) In 1954, the existing northeast-southwest runway at the Luke Air Force Base was again extended by the defendant, so that by June 1, 1954 it was 9,910 feet in length. In addition, construction was begun in January 1954 on a second northeast-southwest runway, situated parallel to and relatively near the first northeast-southwest runway. The second northeast-southwest runway was completed to a length of 10,000 feet and placed in regular operation for use by jet aircraft on June 1, 1954.

(b) During the period from June 1, 1954 to April 30, 1958, inclusive, takeoffs by aircraft from the two northeast-southwest runways at the Luke Air Force Base were made during the several months in the numbers indicated below:

| Month | 1954 | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|---|
| January | | 7,519 | 7,361 | 6,058 | 8,977 |
| February | | 7,688 | 6,684 | 7,351 | 7,021 |
| March | | 12,057 | 7,775 | 8,238 | 7,466 |
| April | | 9,634 | 7,120 | 8,216 | 8,200 |
| May | | 9,476 | 7,026 | 8,402 | |
| June | 11,472 | 9,565 | 6,396 | 7,949 | |
| July | 12,186 | 6,484 | 6,202 | 7,972 | |
| August | 11,346 | 7,926 | 7,041 | 8,384 | |
| September | 10,367 | 7,668 | 6,674 | 9,435 | |
| October | 10,188 | 8,629 | 7,211 | 8,358 | |
| November | 8,072 | 7,599 | 7,258 | 7,588 | |
| December | 6,429 | 5,381 | 7,475 | 7,569 | |

. . .

(c) Approximately 90 percent of the takeoffs referred to in paragraph (b) of this finding were made toward the southwest and in the direction of the lands described in finding 2.

(d) Since June 1, 1954, when the lengthening of the first northeast-southwest runway and the construction of the second northeast-southwest runway at the Luke Air Force Base were completed, flights by jet aircraft taking off from these runways to the southwest, or landing on these runways from the southwest, have passed over tracts 19, 21, and 36 so frequently and at such low altitudes as to interfere seriously with the use and enjoyment of these tracts by their respective owners.

(e) As a result of the lengthening of the first northeast-southwest runway and the construction of the second northeast-southwest runway at the Luke Air Force Base, frequent flights by jet aircraft over tracts 22, 38, and 39 have occurred at lower altitudes since June 1, 1954 than the flights that took place over these tracts during the period January 1, 1952—May 31, 1954.

11. (a) Piloted military aircraft of the following types have been flown at low altitudes frequently over the tracts of land referred to in finding 2:

| | |
|---|---|
| L–20 | B–25 |
| C–47 | F–84 BCE&G |
| H–19 Helicopter | F–84 F |
| H–21 Helicopter | F–80 |
| AT–6 | T–33 |
| F–51 | F–100 |
| B–26 | C–45 |

(b) Piloted military aircraft of the following types have been flown at low

altitudes occasionally over the tracts of land referred to in finding 2:

| | |
|---|---|
| F–86 | KC–97 |
| F–101 | T–29 |
| F–102 | B–66 |
| F–104 | F–89 |
| B–47 | F–94 |
| B–56 | C–54 |
| C–124 | |

12. The interferences by the defendant's jet aircraft with the respective owners' use and enjoyment of the several tracts referred to in findings 9 and 10 have resulted from the noise made and the disturbances created by such aircraft. The noise, averaging 105 decibels and approximating the situation inside a very noisy factory, is inordinately loud and annoying and constitutes a definite hindrance to communication. As a result of the low and frequent flights of jet aircraft over such tracts of land, the occupants of such tracts have become nervous and distraught, and farming operations on the tracts have become more difficult, more expensive, and less productive. These lands have been rendered undesirable for normal residential use and for normal farming operations, and have suffered serious losses in value.

13. The easements of flight taken by the defendant over the tracts of land mentioned in findings 9 and 10 are permanent in nature, as the Luke Air Force Base is a permanent military airport and continued flights by jet aircraft at low altitudes and at frequent intervals over such lands are to be expected for the indefinite future.

14. The easements of flight taken by the defendant over the several tracts of land mentioned in findings 9 and 10 begin at and extend upward from the respective elevations indicated below in terms of feet above the ground level at each tract:

| Name of plaintiff | Tract | Elevation above ground at which easement begins |
|---|---|---|
| Ashby | 36 | 75 |
| Austerman | 24 | 100 |
| Goodyear Farms | 16 | 50 |
| Goodyear Farms | 17 | 70 |
| Goodyear Farms | 18 | 125 |
| Goodyear Farms | 19 | 50 |
| Goodyear Farms | 21 | 50 |
| Goodyear Farms | 22 | 50 |
| Hinton | 23 | 75 |
| Hinton | 25 | 125 |
| Hunt | 38 | 75 |
| Reismann | 39 | 125 |

15. As a result of the taking by the defendant of easements of flight over the tracts of land referred to in findings 9 and 10, such tracts of land diminished in value by the amounts and on the dates indicated below:

| Plaintiff | Tract | Date | Amount |
|---|---|---|---|
| Ashby | 36 | June 1, 1954 | $ 3,500 |
| Austerman | 24 | January 1, 1952 | 14,000 |
| Goodyear Farms | 16 | January 1, 1952 | 13,000 |
| Goodyear Farms | 17 | January 1, 1952 | 14,500 |
| Goodyear Farms | 18 | January 1, 1952 | 3,000 |
| Goodyear Farms | 19 | June 1, 1954 | 3,000 |
| Goodyear Farms | 21 | June 1, 1954 | 500 |
| Goodyear Farms | 22 | January 1, 1952 | 15,000 |
| Goodyear Farms | 22 | June 1, 1954 | 5,000 |
| Hinton | 23 and 25 | January 1, 1952 | 36,500 |
| Hunt | 38 | January 1, 1952 | 12,000 |
| Hunt | 38 | June 1, 1954 | 4,000 |
| Reismann | 39 | January 1, 1952 | 14,000 |
| Reismann | 39 | June 1, 1954 | 2,000 |

16. The evidence does not show any taking by the defendant of property interests from the plaintiffs George W. Busey, B. W. Mullins, and James H. Sharp.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs Ashby, Austerman, Goodyear Farms, Hinton, Hunt, and Reismann are entitled to recover. It is therefore adjudged and ordered:

(1) that the plaintiffs Ralph Ashby and Grace Ashby, husband and wife, recover of and from the United States the amount of three thousand five hundred dollars ($3,500), plus an amount computed at a rate of four (4) percent per annum on $3,500 from June 1, 1954 to the time of payment, all as just compensation for the taking of their property;

(2) that the plaintiffs Raymond F. Austerman and Zula Austerman, husband and wife, recover of and from the United States the sum of fourteen thousand dollars ($14,000), plus an amount computed at a rate of four (4) percent per annum on $14,000 from January 1, 1952 to the time of payment, all as just compensation for the taking of their property;

(3) that the plaintiff Goodyear Farms recover of and from the United States the amount of fifty-four thousand dollars ($54,000), plus an amount computed at a rate of four (4) percent per annum on $45,500 from January 1, 1952 to the time of payment and an amount computed at a rate of four (4) percent per annum on $8,500 from June 1, 1954 to the time of payment, all as just compensation for the taking of its property;

(4) that the plaintiffs Carlon A. Hinton and Verna Hinton, husband and wife, recover of and from the United States the amount of thirty-six thousand five hundred dollars ($36,500), plus an amount computed at a rate of four (4) percent per annum on $36,500 from January 1, 1952 to the time of payment, all as just compensation for the taking of their property;

(5) that the plaintiffs Harold Ralph Hunt and Georgia May Hunt, husband and wife, recover of and from the United States the amount of sixteen thousand dollars ($16,000), plus an amount com-

puted at a rate of four (4) percent per annum on $12,000 from January 1, 1952 to the time of payment and an amount computed at a rate of four (4) percent per annum on $4,000 from June 1, 1954 to the time of payment, all as just compensation for the taking of their property; and

(6) that the plaintiffs George Reismann and Joanna Reismann, husband and wife, recover of and from the United States the amount of sixteen thousand dollars ($16,000), plus an amount computed at a rate of four (4) percent per annum on $14,000 from January 1, 1952 to the time of payment and an amount computed at a rate of four (4) percent per annum on $2,000 from June 1, 1954 to the time of payment, all as just compensation for the taking of their property; and

It is further concluded:

(1) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 36 of the plaintiffs Ashby, as described in finding of fact 2, at an elevation of seventy-five (75) feet and higher above the ground;

(2) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 24 of the plaintiffs Austerman, as described in finding of fact 2, at an elevation of one hundred (100) feet and higher above the ground;

(3) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tracts Nos. 16, 19, 21, and 22 of the plaintiff Goodyear Farms, as described in finding of fact 2, at an elevation of fifty (50) feet and higher above the ground;

(4) that the defendant is vested with a perpetual easement of flight for air-

planes of any character over tract No. 17 of the plaintiff Goodyear Farms, as described in finding of fact 2, at an elevation of seventy (70) feet and higher above the ground;

(5) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 18 of the plaintiff Goodyear Farms, as described in finding of fact 2, at an elevation of one hundred twenty-five (125) feet and higher above the ground;

(6) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 23 of the plaintiffs Hinton, as described in finding of fact 2, at an elevation of seventy-five (75) feet and higher above the ground;

(7) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 25 of the plaintiffs Hinton, as described in finding of fact 2, at an elevation of one hundred twenty-five (125) feet and higher above the ground;

(8) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 38 of the plaintiffs Hunt, as described in finding of fact 2, at an elevation of seventy-five (75) feet and higher above the ground; and

(9) that the defendant is vested with a perpetual easement of flight for airplanes of any character over tract No. 39 of the plaintiffs Reismann, as described in finding of fact 2, at an elevation of one hundred twenty-five (125) feet and higher above the ground; and

It is further concluded that the plaintiffs George W. Busey, B. W. Mullins, and James H. Sharp are not entitled to recover, and the petition is dismissed as to them.