\* The other third-party plaintiffs did not partici-

Cloide C. BRANNING, d/b/a Pleasant Point Plantation, a Partnership

v.

The UNITED STATES

Morgan Guaranty Trust Company of New York, Third-Party Plaintiff.\*

No. 400–76.

United States Claims Court.

Nov. 19, 1984.

pate in the trial on the damages issue.

Paul Martin Wolff, Washington, D.C., for plaintiff; Robert P. Watkins and F. Whitten Peters, Washington, D.C., of counsel.

Walter J. Postula, Washington, D.C., for defendant; Susan V. Cook and Richard W. Eddy, Washington, D.C., of counsel.

Joseph R. Bankoff, Atlanta, Ga., for third-party plaintiff Morgan Guaranty Trust Company of New York; Walter W. Driver, Jr., Atlanta, Ga., of counsel.

## OPINION

WHITE, Senior Judge.

After an overlong and tortuous journey through the legal maze, this case, at long last, is approaching the point of final disposition at the trial level.

### Previous Proceedings

The present litigation began on October 1, 1976, when the plaintiff[1] filed a complaint (then referred to as petition) with this court's predecessor, the United States Court of Claims. The complaint alleged that the United States had taken, by inverse condemnation and without just compensation, an avigation easement, or easement of flight, in the airspace above some land then owned by the plaintiff and located on Ladies Island, Beaufort County, in the coastal region of southeastern South Carolina. The land owned by the plaintiff included approximately 500 acres and was part of a slightly larger area commonly

---

1. Despite the style of the case, the actual plaintiff is Pleasant Point Plantation, a partnership consisting of Cloide C. Branning, H. Jack Pendley, Jr., and David M. Pendley. When the word "plaintiff" is used in the opinion, it will refer to the actual plaintiff.

known as Pleasant Point Plantation. (The 500 acres owned by the plaintiff will sometimes be referred to hereafter as "the property.")

After a trial was held in November 1978, the Court of Claims rendered a decision in July 1981 on the issue of liability (654 F.2d 88). The court held in its Conclusion of Law that "a taking has occurred" (*id.* at 103), thereby adversely affecting the highest and best use for the plaintiff's property, which had been for medium density residential development (654 F.2d at 96).

The Court of Claims' opinion on liability indicated that the taking of an avigation easement occurred as a result of flights by heavy military jet aircraft (twin-engine F–4's) through the airspace above the property, in a pattern known as Field Mirror Landing Practice ("FMLP"). The pattern, insofar as it affected the property, consisted of practice takeoffs from and landings on runway 04/22 at the Marine Corps Air Station in Beaufort, South Carolina ("MCAS-Beaufort"), designed to simulate takeoffs from and landings on an aircraft carrier.

Pleasant Point Plantation is located quite near, and east of, MCAS-Beaufort. While performing the FMLP pattern from runway 04/22, the F–4 aircraft followed one another almost nose-to-tail in an unvarying loop. The phase of the FMLP operation which led the Court of Claims to decide that an avigation easement had been taken in the airspace above the property was when the F–4 aircraft flew above the property at an altitude of 600 feet above ground level, with noses up and tails down, and with the near-maximum power and noise associated with low speed.

There were and are two runways at MCAS-Beaufort: 04/22, which is the principal runway and lies on a northeast/southwest axis; and 14/32, which lies on a northwest/southeast axis. The evidence indicates that, in earlier years, at least some FMLP operations utilized runway 14/32, but they did not affect Pleasant Point Plantation adversely enough (if at all) to result in the taking of an avigation easement in the airspace above the property. Only FMLP operations by F–4 aircraft from and to runway 04/22 resulted in the taking that is involved in this case.

The Court of Claims, having decided the issue of the defendant's liability in favor of the plaintiff, remanded the case to the court's Trial Division for further proceedings to determine the date when the avigation easement was taken, the amount of the recovery, and the proper distribution of such amount among the plaintiff and a number of third-party plaintiffs that had entered the case after the complaint was filed.

On October 1, 1982, the case was transferred to this court pursuant to Pub.L. 97–164, § 403(d) (1982).

Two of the unresolved matters transferred to this court for determination—the date of the taking and the proper distribution among the parties plaintiff of whatever amount may be recovered—were subsequently disposed of without the necessity of holding a further trial on those questions. The date of the taking was determined to be January 1975; and the amount of the recovery is to be distributed among the parties plaintiff in accordance with a stipulation filed by them.

The parties endeavored, through extensive negotiations, to reach an agreement on the amount of the recovery, but such negotiations were ultimately unsuccessful. Finally, after several trial dates on the amount of the recovery had been fixed by the court and later cancelled at the request of one or more parties, such a trial was held in the latter part of May and the early part of June 1984. The post-trial filing by parties of requests for supplementary findings of fact, briefs, objections to requested findings, and reply briefs was completed on November 1, 1984.

It is now necessary for this court to determine the value of the property interest which the Government took in January 1975.

The value of the easement will be measured by the diminution in the fair market

value of the plaintiff's property as a result of the avigation easement being taken by the Government. *Avery v. United States,* 165 Ct.Cl. 357, 381, 330 F.2d 640 (1964); *Matson v. United States,* 145 Ct.Cl. 225, 244, 171 F.Supp. 283 (1959); *Adaman Mutual Water Co. v. United States,* 143 Ct.Cl. 921, 933, 181 F.Supp. 658, 666 (1958). The diminution in value is derived from the difference between the fair market value of the plaintiff's property shortly before and shortly after the avigation easement was taken in January 1975. *A.J. Hodges Industries, Inc. v. United States,* 174 Ct.Cl. 259, 267–68, 355 F.2d 592, 597–98 (1966); *Aaron v. United States,* 160 Ct.Cl. 295, 301, 311 F.2d 798, 802 (1963); *Mid-States Fats and Oils Corp. v. United States,* 159 Ct.Cl. 301, 310 (1962).

 The proper standard to use in determining fair market value is " 'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979), quoting from *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943).

### Pleasant Point Plantation

Pleasant Point Plantation, as previously stated, is located on Ladies Island, South Carolina. Ladies Island as of January 1975 was—and it still remains—largely an undeveloped, vacant island. There are numerous large tracts of undeveloped land on the island. In 1975, Ladies Island had a population of 2,717. The island includes 22,675 acres (35.4 square miles), of which only 6,996 acres are considered developable.

The nearest urbanized area to Ladies Island is across the Beaufort River in Beaufort, South Carolina.

Pleasant Point Plantation is an irregularly shaped parcel of land, running generally from north to south and including approximately 525 acres. It has very irregular exterior boundary lines, the distance around the perimeter of the parcel being 5.8 miles. The distance between the northern and southern extremities of the Planta-

tion is approximately twice as great as the distance between the eastern and the western extremities. As indicated earlier, the portion of Pleasant Point Plantation owned by the plaintiff as of January 1975 included approximately 500 acres.

Pleasant Point Plantation is located about 14 miles, by road, north of Beaufort; and the road connecting the Plantation with Beaufort passes over a bridge across the Beaufort River. The Plantation is 90 road miles from Charleston, South Carolina, 55 miles from Hilton Head Island, South Carolina, and 52 miles from Savannah, Georgia.

Pleasant Point Plantation is bounded partially on the south by the Beaufort River and on the west by Brickyard Creek, and elsewhere by coastal marshlands. The Intracoastal Waterway runs through this part of South Carolina, utilizing the Beaufort River and Brickyard Creek. The waterway touches the southern portion of the Plantation for a distance of several thousand feet, and provides the only deep-water access to the Plantation. No facilities for the utilization of the waterway had been constructed on the Plantation as of January 1975.

Pleasant Point Plantation is located directly across Brickyard Creek from, and to the east of, MCAS-Beaufort.

Pleasant Point Plantation has much natural beauty on the Plantation itself and in the scenic surroundings, which provide attractive vistas of tidal streams and coastal marshlands. The trees and other vegetation on the Plantation are unusually varied and handsome. The timber is largely hardwood, consisting of live oak, hickory, and cypress trees. As many of the trees have been growing in open fields for many years, they have achieved a very picturesque canopy shape. There are manmade lakes on the Plantation. Birds and other wildlife abound on the Plantation.

At all times material to this case, there has been on the southern tip of Pleasant Point Plantation, adjacent to the Intracoastal Waterway, a large, traditionally de-

signed plantation home, surrounded by large, mature live oak trees. The house has some architectural interest and merit. Then in rather poor condition, the house was. within the portion of the Plantation owned by the plaintiff as of January 1975.

### Early Development

It is not clear from the evidence just when the planning began for the use of Pleasant Point Plantation as a residential-recreational retirement community. The evidence does show, however, that planning to that end began some years before 1969, but that very little actual development work had been accomplished by that year.

Pleasant Point Plantation was planned as a medium-density residential development. The Master Development Site Plan dated October 12, 1973, included 462 single-family residential lots within a total area of approximately 525 acres, plus an area zoned for condominiums, a golf course, tennis courts, a clubhouse, parking lot, recreational areas and roadways, and a 13-acre commercial site.

Pleasant Point Plantation, except for approximately 60 lots located in the southern part of the Plantation that had already been sold by the previous owners of the project, was purchased by the plaintiff in 1973. As of that time, there had been some development of Pleasant Point Plantation for residential use as a retirement community. For example, an 18-hole golf course had been constructed. The golf course was within the portion purchased by the plaintiff.

In 1974, the plaintiff obtained from the Atlanta National Real Estate Trust, after an investigation of Pleasant Point Plantation had been made on behalf of the Trust, a commitment for a loan in the amount of $2,500,000 to finance the development of a portion of the plaintiff's property.

The plaintiff sold a couple of lots, in addition to the 60 or so previously mentioned, between 1973 and January 1975. As of the latter time, the plaintiff still owned the major part of Pleasant Point Plantation, his ownership consisting of approximately 500 acres.

By January 1975, the critical date in this case, a substantial amount of development work had been accomplished by the plaintiff and its predecessor owners of the project. A nine-hole golf course was constructed in 1970, and the course was increased in size to 18 holes in 1971. As of January 1975, the golf course was in fair shape, and two tennis courts were under construction. A modest clubhouse, with somewhere between 1,200 and 1,500 square feet of floor space (the precise amount is not clear from the evidence) had been constructed. Six houses had been built on lots previously sold. Electricity was available to the property, but water and sewer systems were available to less than half of the lots. Some grading of roads had been done.

### Scope of Easement

In the proceedings on the amount of the recovery, a question arose as to whether the avigation easement that was taken by the defendant extended horizontally (at an altitude of 600 feet above ground level) through the airspace above the entire area of the plaintiff's property (the position taken by the parties plaintiff), or only through the airspace above that portion of the property affected most seriously as of January 1975 by the noise generated by the FMLP operations above the property (the defendant's position).

In view of the allegations in the complaint that the avigation easement taken by the defendant affected the use and value of the entire Pleasant Point Plantation, the Court of Claims' succinct holding that "a taking has occurred" (654 F.2d at 103), without limitation, seems to imply that the taking involved the airspace over the entire property at 600 feet above ground level. This would support the position of the plaintiff.

Also, the plaintiff's position is supported more clearly by the court's factual finding (number 27) to the effect that the noise over the property caused by defendant's

airplanes renders "those premises" unfit for residential use.

The defendant, on the other hand, can find support for its position that the avigation easement in this case affects the airspace over only a portion of the property in various findings of fact made by the Court of Claims: *e.g.*, that the noise made by F–4 aircraft when flying FMLP patterns is burdensome "where the aircraft passes directly over plaintiff's property" (finding 34); that the property "over which the F–4 flights occur" at an altitude of 600 feet above ground level is, and will continue to be, unsuitable for residential development (finding 88); that the potential of the property as a residential development has been "substantially diminished" (finding 25); and that "[s]ignificant portions" of the property are unsuitable for residential use (finding 85).

There are similar statements in the Court of Claims' opinion that seem favorable to the defendant's position: *e.g.*, that there is evidence of the impact of military aircraft "on that part of plaintiff's property" over which such aircraft were operating when flying the FMLP pattern (654 F.2d at 96); that FMLP training flights by the defendant's F–4 aircraft over the property had the effect of "limiting" the plaintiff's exploitation of the property as a medium density residential development, which had previously been its highest and best use (*id.*); and that "at least part of plaintiff's property" had been designated as unsuitable or unacceptable for medium density residential use (*id.*).

Thus, the Court of Claims' opinion and findings of fact in this case, standing alone, do not make it clear whether the court was saying that the easement taken by the defendant involved the airspace over the entire area of the plaintiff's property, or only over the portion of the property most seriously affected by the noise from overflights by F–4 aircraft performing FMLP operations. We must turn, therefore, to previous decisions by the Court of Claims for guidance.

The case of *Matson v. United States, supra,* involved a similar problem with respect to the extent of an avigation easement taken by the Government. The area of land involved in that case (357.7 acres) was somewhat smaller than the area involved in this case (approximately 500 acres). The evidence in *Matson* showed that flights by government-owned aircraft over the claimants' property adversely affected the highest and best use for only 20 acres out of the total area of 357.7 acres. Nevertheless, the court held (145 Ct.Cl. at 229, 171 F.Supp. at 286) that there was "a taking of a perpetual easement of flight by defendant for its planes over the entire property of plaintiffs' 357.7 acres \* . \* \* \* " (footnote omitted). *Accord: Speir v. United States,* 202 Ct.Cl. 1020, 1025, 485 F.2d 643, 647 (1973); *A.J. Hodges Industries, Inc. v. United States, supra,* 174 Ct.Cl. at 266, 355 F.2d at 596–97.

■ In the light of the earlier precedents, the Court of Claims' statement in this case that "a taking has occurred" (654 F.2d at 103) is construed as a holding that the avigation easement taken by the defendant extended through the airspace over the entire area of the plaintiff's property. Consequently, the United States has taken a permanent easement giving it the right to conduct FMLP operations (or other equally or less noisy operations) with F–4 aircraft (or other equally or less noisy aircraft) over any part of the plaintiff's property at an altitude of 600 feet above ground level, or higher.

■ In determining the fair market value of the plaintiff's property shortly after the taking of the easement, however, it is appropriate to consider whether, at that time, there was any reasonable prospect that the United States would thereafter ever elect to exercise such right over any portion of the plaintiff's property not already affected adversely by the FMLP operations as of the date of the taking.

As pointed out subsequently in the opinion, the expert testimony offered by the defendant at the trial concerning the after-taking value of the plaintiff's property was

flawed by the assumption that the highest and best use of the plaintiff's property for medium density residential development was not affected as a result of the defendant's action in taking the avigation easement. Conversely, the expert testimony offered by the parties plaintiff on the after-taking value of the property was defective because of the assumption that no part of the plaintiff's property was suitable for residential development after the taking.

*Some Expert Testimony on Valuation*

1. Hansell Merrill Pasco, Jr.

This witness was presented by the parties plaintiff, and accepted by the court, as an expert in the field of land-use planning. He is an architect and land planner, who lives and maintains offices on Hilton Head Island, South Carolina. He has had extensive experience in developing master plans for residential-recreational development of planned units in Beaufort County and elsewhere on the Eastern Seaboard of the United States, as well as in some foreign countries.

Mr. Pasco expressed the opinion that the highest and best use for Pleasant Point Plantation, shortly before the avigation easement was taken by the defendant in January 1975, was for a residential-recreational development much more dense in population than the 1973 master plan previously mentioned. Whereas the 1973 master plan provided for the sale and utilization of 462 residential lots on a medium-density basis, Mr. Pasco testified that the highest and best use of the property, absent the avigation easement, would provide for the sale of 793 residential lots.

Furthermore, Mr. Pasco's plan of development was based in part upon the assumption that, before the heavy concentration of FMLP operations above Pleasant Point Plantation by F–4 aircraft in January 1975, the property had not been adversely affected to any extent by military jet aircraft operations. To illustrate what he meant, the witness gave as an example the situation at his home on Hilton Head Island, where (according to the witness) from 3 to 5 times per week, and virtually always in the daytime, a jet aircraft can be heard and seen passing by somewhere in the area.

Although Mr. Pasco is qualified, by training and experience, to testify as an expert with respect to the subject matter of his testimony, his opinion that the highest and best use for Pleasant Point Plantation shortly before the taking of the avigation easement by the defendant was for high-density residential-recreational development, is not adopted by the court.

In the first place, the opinion of the witness is inconsistent with the Court of Claims' determination (654 F.2d at 96) that the highest and best use for the property before the taking of the avigation easement was "as a medium density residential development." In the absence of any further explanation by that court of the sense in which it used the term "medium density," it is inferred from the court's findings, particularly finding 7, that the court used the term with reference to the sort of development provided for in the 1973 Master Development Site Plan.

Furthermore, Mr. Pasco's assumption that, before the avigation easement was taken, the property had not been affected adversely by aircraft operations at MCAS-Beaufort is inconsistent with the decision by the Court of Claims on the issue of liability. According to the Court of Claims, the evidence received at the trial on liability "clearly establishes" that, as a result of aircraft operations at MCAS-Beaufort, some portions of Pleasant Point Plantation had already been rendered unsuitable for residential development as early as 1973 (654 F.2d at 96).

It apparently was not clear from the evidence at the first trial to what extent this adverse effect on the property as of 1973 had been caused by overflights through the airspace directly above the property, as distinguished from nearby flights, engine run-ups on the base at MCAS-Beaufort, etc. Consequently, the evidence was not sufficient to establish that the defendant had taken an avigation

easement in the airspace above Pleasant Point Plantation as of 1973. The Court of Claims had previously held that even though aircraft operations by the Government adversely affect the usefulness and value of realty, there is no taking of an avigation easement in the airspace above the property unless such adverse effect results from aircraft flights through the airspace directly above the property. *Avery v. United States, supra,* 165 Ct.Cl. at 365–66, 330 F.2d at 645.

■ Mr. Pasco expressed the opinion that agricultural use was probably the highest and best use for the plaintiff's property after the avigation easement was taken by the Government. As explained later, the court determines that development for low-density residential purposes was the after-taking highest and best use.

#### 2. Louis Reid Schott

This witness presented by the parties plaintiff has been a professional appraiser for the past 12 years. He lives in Marietta, Georgia, and his business office is Atlanta, Georgia. He holds a bachelor's degree from the University of Denver, with a minor concentration in real estate; he has attended the Graduate School of Business at Georgia State University; and he has attended the American Institute of Real Estate Appraiser's courses covering appraisal principles and other subjects. He is a member of the American Institute of Real Estate Appraisers and is entitled to use the designation "MAI" in his professional role.

Mr. Schott expressed the opinion that the pre-taking fair market value of the plaintiff's property was $4,153,603.

It is apparent at the outset that Mr. Schott's opinion on evaluation must be carefully scrutinized. In the first place, he based his valuation estimate on the 525-acre parcel constituting the original Pleasant Point Plantation project, whereas the evidence in the record shows that the plaintiff owned only about 500 acres of the property as of January 1, 1975.

Also, Mr. Schott, in forming his opinion with respect to the pre-taking value of the plaintiff's property, assumed that there had been no adverse impact on the property from military aircraft operations before January 1, 1975. As pointed out in discussing the expert testimony of Hansell Merrill Pasco, Jr., the Court of Claims, contrary to Mr. Schott's assumption on this point, said that the evidence before the court "clearly establishes" that military aircraft operations had rendered portions of Pleasant Point Plantation unsuitable for residential development as early as 1973 (654 F.2d at 96), although there had been no taking of an avigation easement that early.

This court, in determining the fair market value of the plaintiff's property shortly before the avigation easement was taken in January 1975, is concerned with the value of the property in its actual condition and situation at the time. Consequently, evidence concerning the adverse effect on the property that had already occurred from any source, including aircraft operations of any kind, whether directly overhead, nearby, or on the base at MCAS-Beaufort, is pertinent in determining the fair market value of the plaintiff's property shortly before January 1975. *Cf. Jensen v. United States,* 158 Ct.Cl. 333, 341, 305 F.2d 444, 448–49 (1962).

Moreover, in coming to a conclusion with respect to the pre-taking value of the plaintiff's property, Mr. Schott assumed that, absent any avigation easement, the remaining unsold lots within the plaintiff's property could be sold over a period of years at prices comparable to the prices actually obtained during a similar period for lots in three retirement-recreational projects also located in the coastal area of southeastern South Carolina: *namely,* Moss Creek, Fripp Island, and Royal Pines, but giving most weight to Moss Creek prices. The evidence in the record, however, indicates that, shortly before January 1975, there was a wide discrepancy between Pleasant Point Plantation and Moss Creek Plantation, upon which Mr. Schott placed the greatest reliance. As of the critical period

involved here, there was already a heavy investment in improvements at Moss Creek Plantation, involving a marina, two golf courses, a swimming pool, tennis facilities, an equestrian center, a security gate, and heavy security within the plantation. It was mentioned previously that Pleasant Point Plantation, just before January 1975, had a golf course and a small clubhouse; two tennis courts were under construction; and only six houses had been constructed on the project.

■ In addition, Mr. Schott's pre-taking fair market value of $4,153,603 included a profit of approximately $1,000,000, which, in his opinion, would have been realized by the developer of the property through the sale of the remaining lots, absent an avigation easement. It has been mentioned earlier in the opinion that the proper standard to use in determining fair market value is what a "willing buyer" would pay in cash to a "willing seller" for the property in question. In view of the financial risks that would have been involved in the future development of the plaintiff's property, even absent any avigation easement, it hardly seems reasonable to assume that the hypothetical "willing buyer" would have agreed to pay in cash to the "willing seller" a price that would include all the profit which the "willing buyer" expected to derive from the future development of the property, if all went well. That is doubtless the reason why, in a case where the Government has taken a property interest, compensation for the interest taken does not include future loss of profits. *See United States v. General Motors Corp.,* 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945).

Mr. Schott expressed the opinion that the fair market value of the plaintiff's property just after the taking of the avigation easement was $750,000. This was based upon the witness' conclusion that the highest and best after-taking use for the property would be limited residential, recreational, or agricultural use, or possibly a combination of the three types of use. As explained later, the court determines, upon the basis of the opinion of another expert witness presented by the parties plaintiff, that low-density residential use was the highest and best use for the property after the avigation easement was taken.

Also, Mr. Schott's opinion on the after-taking value of the plaintiff's property must be considered in relation to the known fact that the property involved here was sold in 1981 by the then owners of the property (third-party plaintiff Morgan Guaranty Trust Company of New York and a subsidiary) for $2,200,000. (The evidence in this record indicates that the 1981 purchasers were unaware of the existence of the avigation easement, but this factual matter was not at issue in the present case.)

### 3. Jean M. Little

Jean M. Little was presented as an expert witness by the parties plaintiff. Mr. Little is a professional real estate appraiser, and maintains his office in Spartanburg, South Carolina. He graduated from the University of Georgia in 1950. He began performing real estate appraisals approximately 10 years ago. He is a member of the American Institute of Real Estate Appraisers and, at the time of the trial, was serving as president of the South Carolina chapter of the Institute. He is also a member of the National Association of Realtors. In 1977, he received his certificate as an "MAI." Mr. Little has done appraisals of many coastal properties located in South Carolina, including a great deal of work in Beaufort County, South Carolina, and in neighboring states.

Mr. Little expressed the opinion that the plaintiff's property had a fair market value of $5,435,000 shortly before the avigation easement was taken by the Government. In arriving at this figure, Mr. Little calculated the net income which, in his view, would be realized by the developer of the project over a period of years to an advanced state of development; and he then used a compound interest rate formula to discount the expected ultimate net income to a fair market value as of a time shortly before January 1975.

Mr. Little's pre-taking figure of $5,435,-000 is not adopted by the court as the pre-taking fair market value of the property, for reasons that will be mentioned in subsequent paragraphs.

In the first place, Mr. Little's figure is based upon the development of the plaintiff's property, absent an avigation easement, in accordance with a high-density residential-recreational plan. As stated heretofore, such a plan of development would have been inconsistent with the Court of Claims' determination that the highest and best use for the plaintiff's property, absent an avigation easement, was for medium-density residential development.

Also, Mr. Little's figure of $5,435,000 includes a developer's profit of more than $1,000,000. It has been pointed out previously, in discussing Mr. Schott's testimony, that future loss of profits is not a proper element of compensation in a situation where the Government has taken a property interest.

In addition, the witness did not take into account, in formulating his pre-taking fair market value, the determination by the Court of Claims that the property had already been affected adversely by aircraft operations at MCAS-Beaufort before the actual taking of an avigation easement by the Government.

Moreover, Mr. Little considered prices received by developers from the sale of lots at Hilton Head Plantation and Palmetto Dunes, which are located on Hilton Head Island, and at Moss Creek Plantation and Fripp Island, which are located on Ladies Island. Pleasant Point Plantation, as of January 1975, was not comparable to any of the developments mentioned, as regards the state of development and the existing amenities. In addition, Hilton Head Plantation, Palmetto Dunes, and Fripp Island all had ocean frontage, and their residents had access to ocean beaches. Pleasant Point Plantation did not have—and does not have—any beach, and its residents must travel a substantial distance in order to gain access to an ocean beach.

Turning to the question of after-taking value, Mr. Little expressed the opinion that the highest and best after-taking use of the plaintiff's property would be for low-density residential development. This would involve combining into larger lots some of the lots as shown on the 1973 master plan, thus allowing the developer to minimize development costs; and then dividing the remainder of the undeveloped property into mini-estates and selling them to whoever might be inclined to buy them for residential use. On this basis, the after-taking fair market value of the plaintiff's property would be somewhere between $900,000 and $1,250,000, according to Mr. Little.

Mr. Little's opinion that, despite the taking by the Government of an avigation easement in the airspace above the plaintiff's property, the property could nevertheless be developed for low-density residential use is adopted by the court.

The evidence in the record shows clearly that the airspace above the plaintiff's property is invaded by military aircraft engaged in FMLP operations when—and only when—such operations are conducted from and to runway 04/22 at MCAS-Beaufort. The evidence also shows that military aircraft performing FMLP operations from runway 04/22 invade the airspace above the plaintiff's property at the 600 foot elevation above ground level only when flying over the northern portion of the property (although the actual flight path of the aircraft is not clearly delineated).

Consequently, such operations affect the use and enjoyment of the northern portion of the plaintiff's property to a much greater extent than they affect the southern portion of the property. Indeed, according to the evidence in the record, the noise from FMLP operations by F-4 aircraft actually in progress above the northern portion of the plaintiff's property is not unduly disturbing to the human ear in the southern portion of the property. Also, with care and some additional expense in the construction and insulation of residences, some residential use can be made of areas

reasonably close to the flight path of F–4 aircraft engaged in FMLP operations.

The court has determined, in its discussion of "Scope of Easement," that the avigation easement which the defendant took in this case extended horizontally through the airspace over the entire property, and, therefore, the Government has a right to conduct such operations over any part of the plaintiff's property at an elevation of 600 feet above ground level. However, the hypothetical "willing buyer," in determining the price that he would agree to pay the "willing seller" for the plaintiff's property after the avigation easement was taken, would undoubtedly take into consideration what the likelihood was that the Government would ever exercise this right over any part of the plaintiff's property other than the northern portion already affected by the FMLP operations. *Cf. Highland Park, Inc. v. United States*, 142 Ct.Cl. 269, 274, 161 F.Supp. 597, 601 (1958). There is no evidence in the record indicating even a remote probability that the Government may sometime construct at MCAS-Beaufort a new runway from which military aircraft might perform FMLP or other very noisy operations in a pattern which would cause the aircraft to invade the airspace above some other portion of the plaintiff's property at the 600-foot elevation above ground level. Consequently, the court determines that the "willing buyer" would reach the same conclusion as Mr. Little, *i.e.*, that, despite the taking of an avigation easement by the Government in January 1975, the plaintiff's property would nevertheless be developable for low-density residential purposes.

In connection with Mr. Little's after-taking fair market value, however, this must be scrutinized in the light of the known fact that the property under consideration was sold in 1981 for $2,200,000.

### 4. Roy L. Gordon, Jr.

Roy L. Gordon, Jr., was presented as an expert witness by the defendant.

Mr. Gordon graduated from the University of Florida in 1958; and, through the years since 1958, he has completed various educational courses and seminars offered by the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers. He has been a professional real estate appraiser for 26 years. Since 1967, Mr. Gordon has been a member of the American Institute of Real Estate Appraisers and, therefore, is entitled to use the designation "MAI" in his professional activities. He is also a Senior Real Estate Analyst, Society of Real Estate Appraisers; a member of the American Society of Real Estate Counselors; and a Certified Property Manager, Institute of Real Estate Management. He maintains his office in Atlanta, Georgia.

Mr. Gordon has performed real estate valuation assignments for major domestic and foreign corporations, banks, savings and loan associations, and life insurance companies throughout the Southeastern United States. He has also done appraisal work for federal, state, and local government agencies.

Mr. Gordon expressed the opinion that the highest and best use for the plaintiff's property shortly before January 1975 was for residential subdivision; and that the property had a fair market value at that time of $1,230,000. In reaching this figure, Mr. Gordon predominantly used data from what he regarded as comparable residential developments located on Ladies Island, which is also the location of Pleasant Point Plantation, and reports prepared by a consulting engineer concerning the probable cost of developing the portion of Pleasant Point Plantation owned by the plaintiff as of January 1975.

Mr. Gordon's pre-taking figure of $1,230,000 must be carefully considered in the light of the known fact that in 1974 the Atlanta National Real Estate Trust, after an investigation of Pleasant Point Plantation and its future prospects, was willing to provide a loan in the amount of $2,500,000 to finance a development of a portion of the plaintiff's property. (The investigation did not develop the information that, as determined by the Court of Claims, military aircraft operations had already made some

portions of the plaintiff's property unsuitable for residential development.)

The defendant proposed that Mr. Gordon also express his opinion on the after-taking fair market value of the plaintiff's property. The parties plaintiff objected to such testimony from Mr. Gordon, on the ground that Mr. Gordon's after-taking figure was based upon his view that the highest and best use for the entire area of the plaintiff's property, after the taking of the avigation easement by the Government, was still for medium-density residential development, and that this concept of after-taking use was contrary to the decision of the Court of Claims on liability.

The objection was sustained by the court. In its decision on liability, the Court of Claims expressly held (654 F.2d at 96) that the FMLP operations by F-4 aircraft through the airspace above the plaintiff's property at an elevation of 600 feet above ground level had detracted from and interfered with "plaintiff's full enjoyment of the property·by limiting plaintiff's exploitation of it as a medium density residential development, its highest and best use."

### Determination of Value

The several professional real estate appraisers whose expert opinions on valuation are briefly summarized in the preceding part of the opinion have excellent qualifications that entitle them to provide, for the assistance of the court, helpful opinions on the issues of the pre-taking and the after-taking fair market value of the plaintiff's property.

After carefully considering the whole record, however, the court regretfully decides, for the reasons previously mentioned, that no witness has provided the court with a satisfactory answer to the question of the pre-taking fair market value of the plaintiff's property.

Some comfort is derived by the court from the circumstance that courts in the past have recognized that the concept of just compensation cannot be "reduced to a formula" or to "inexorable rules" (*Miller v. United States*, 223 Ct.Cl. 352, 377, 620 F.2d

812, 824–25 (1980)); and that, in the final analysis, valuation is generally a matter of judgment (*United States v. Miller, supra,* 317 U.S. at 375, 63 S.Ct. at 280).

The Court of Claims recognized in a number of cases that it is sometimes necessary to resort to a determination in the nature of a jury verdict in order to decide the question of valuation or damages in a case where the record does not contain the data needed for a precise determination: *e.g., Aaron v. United States,* 167 Ct.Cl. 818, 826, 340 F.2d 655, 660 (1964); *Clemens Construction Co. v. United States,* 160 Ct.Cl. 675, 679 (1963); *Dee Hong Lue v. United States,* 150 Ct.Cl. 655, 667, 280 F.2d 849, 856 (1960). This court, as successor to the Court of Claims' trial jurisdiction and functions, finds it necessary to exercise the same prerogative in the present case.

■ Utilizing the "jury verdict" approach as a matter of necessity in order that this rather ancient case may finally be disposed of at the trial level, and having considered the entire record, particularly the testimony of the expert witnesses, insofar as it bears upon the issue of the value of the interest taken by the defendant in the plaintiff's property, the court determines and finds as follows:

(1) Shortly before the taking of the avigation easement by the Government in January 1975, the fair market value of the plaintiff's property for development as a medium-density residential-recreational project (excluding the portions that were already unsuitable for such development) was $3,250,000. The willingness of the Atlanta National Real Estate Trust in 1974 to make a loan of $2,500,000 on the property was a clear indication that the Trust considered the fair market value of the property to be much greater than $2,500,000 and that the loan would be well secured. This factor must be discounted to some extent in view of the circumstance that the Trust was unaware of the extent to which portions of the property had already been adversely affected by military aircraft operations.

(2) Shortly after the taking of the avigation easement, the fair market value of the property for development as a low-density residential-recreational project was $1,250,-000. This is Mr. Little's top figure. It has not been adjusted upward on the basis of the known fact that the property was sold in 1981 for $2,200,000, due to the lack of information in this record concerning the effect of inflation between 1975 and 1981 or what the selling price would have been if the purchaser had known about the avigation easement.

(3) The fair market value of the plaintiff's property was thus diminished to the extent of $2,000,000.

### Interest

In an unpublished order entered by this court in the present case on March 8, 1984, the court discussed the matter of interest and stated that, on the basis of past precedents by the Court of Claims and this court, an amount equivalent to interest would be allowed on the award, all as part of just compensation, at the rate of 7½ percent for the year 1975, at the annual rate of 8½ percent for the years 1976–79, and at an annual rate for the years 1980 and thereafter, until the award is paid, at a rate based upon the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97).

Later, the parties plaintiff, citing decisions by other courts, urged that the amount of the interest equivalent should be computed on the basis of compound interest.

It is concluded, however, that it is both advisable and necessary in this case to follow the past practice of the Court of Claims and of this court (*e.g., Foster v. United States*, 3 Cl.Ct. 738, 744 (1983)), by using the simple interest method.

### Conclusion

For the reasons previously stated in the opinion, the court finds and determines that:

(1) the defendant in January 1975 took a permanent avigation easement, or easement of flight, in the airspace above the entire area of the plaintiff's property, beginning at an elevation of 600 feet above ground level and extending upward, for overflights by F-4 aircraft (or other aircraft equally as noisy as, or less noisy than, the F-4) engaged in FMLP operations (or other operations by military aircraft equally as noisy as, or less noisy than, FMLP operations by F-4 aircraft);

(2) the fair market value of the plaintiff's property was diminished in January 1975 to the extent of $2,000,000 as a result of the taking by the defendant of the avigation easement referred to in paragraph numbered (1) of this conclusion; and

(3) the parties plaintiff are entitled to recover $2,000,000, plus an amount equivalent to simple interest, all as part of just compensation for the property interest taken by the defendant, computed at the rates previously fixed in the court's order of March 8, 1984.

The entry of judgment will be deferred pending a determination regarding the amount of the reimbursement for reasonable litigation expenses incurred by the parties plaintiff in the prosecution of the case.

The parties are allowed a period of 30 days from the date of this opinion within which to file:

(1) a stipulation setting out the amount of the reimbursement for allowable litigation expenses as to which agreement has been reached; and

(2) separate statements by the parties setting out their respective positions, with supporting data and arguments, if there are items of alleged expense as to which the defendant has not agreed.

IT IS SO ORDERED.